# ABERDEEN BANK *v.* CHEHALIS COUNTY.

ERROR TO THE SUPREME COURT OF THE STATE OF WASHINGTON.

No. 38. Argued April 30, 1896. — Decided April 12, 1897.

This court is bound by the decision of the Supreme Court of the State of Washington, (in which it concurs,) that § 21 of the act of that State of March 9, 1891, relating to the taxation of national banks in that State, is to be read in connection with § 23 of the same act, and that when so read they do not impose upon such banks a tax forbidden by Rev. Stat. § 5219. *National Bank* v. *Commonwealth,* 9 Wall. 353, affirmed and followed in this matter.

Money invested in corporations or in individual enterprises that carry on the business of railroads, of manufacturing enterprises, mining investments and investments in mortgages, does not come into competition with the business of national banks, and is therefore not within the meaning of the provision in Rev. Stat. § 5219, forbidding state taxation of its shares at a greater rate than is assessed upon other moneyed capital in the hands of citizens of the State.

Insurance stocks may be taxed on income instead of on value; and deposits in savings banks and moneys belonging to charitable institutions may be exempted without infringing the provisions of that section of the Revised Statutes.

The allegations of the complaint do not show that any moneyed capital of the bank of the character defined by the decisions of this court was omitted or intended to be omitted by the assessor, and those allegations are so general in these respects that they cannot be made the basis of action.

THE First National Bank of the city of Aberdeen, State of Washington, a banking corporation organized under the national banking laws of the United States, filed its complaint in the Superior Court of the said State, for the county of Chehalis, May 16, 1892, against the county of Chehalis and J. M. Carter, as *ex officio* tax collector of the county, seeking to enjoin the defendants from levying upon the safes, time locks and other personal property of the complainant, for the purpose of collecting a tax upon the shares of its capital stock. The defendants demurred to the complaint, and the demurrer having been sustained, and the complainant having refused to amend its complaint, judgment was entered in the said court,

September 13, 1892, in favor of the defendants. The complainant took the case upon writ of error to the Supreme Court of the State, where the judgment was affirmed.  6 Washington, 64.  The complainant then sued out a writ of error bringing the case here.

The essential allegations of the complaint were that the capital stock of the bank consisted of 500 shares of $100 each ; that all of the stock was paid up, and was owned in part by citizens of the State of Washington resident therein, and in part by citizens of the United States residing outside of the State; that the assessor of the said county was charged, under the provisions of an act of the legislature of the said State, approved March 9, 1891, entitled "An act to provide for the assessment and collection of taxes in the State of Washington and declaring an emergency," with the duty of preparing an assessment roll of all the property subject to taxation in the said county, as owned and there subject to taxation on April 1, 1891; that thereupon the assessor proceeded to make out an assessment roll, wherein he listed to the complainant, as owner thereof, all of its capital stock, and, though informed by the complainant of the residence of each of the stockholders, and of the amount of stock held by each of them on April 1, 1891, assessed the capital stock *in solido* to the complainant as owner thereof, at a total valuation of $50,000; that upon the said assessment the defendant Carter, as treasurer, was officially directed to collect from the complainant a tax in the amount of $686.25; that the tax not having been paid, the said defendant, as treasurer, on March 1, 1892, declared the same delinquent, and added thereto a certain sum by way of penalty for non-payment, and a certain sum as interest, and was about to proceed to collect the total amount, being $787.22, by levying upon the safes, time locks and other property used by the bank, and that if he were permitted so to do the complainant would suffer irreparable injury.  That on April 1, 1891, there existed in the said county moneyed capital, other than that invested in shares of stock of national banks and banking business, owned by citizens of the State resident in that

county, and there invested in loans and securities owing by other citizens of the State residing in the county, exceeding the sum of $237,400; that there existed in the State moneyed capital owned by citizens of the State who were residents of other counties thereof (aside from the capital invested in banks and banking business), invested in loans and securities owing by citizens of the State residing in counties other than the county aforesaid, exceeding the sum of $14,000,000; that the total capitalization of national banks located in the State was the sum of $7,000,000, and the total capitalization of banks there located, incorporated under the laws of the State, the sum of $4,000,000; that large amounts of moneyed capital were invested in the State, by residents thereof, in the stocks and bonds of insurance, wharf and gas companies, which amounts, together with all the moneyed capital above mentioned, made an aggregate of at least $26,000,000; that these facts were well known to the several assessors and other taxing officers throughout the State, but that the moneyed capital referred to, other than the said capital of the national and state banks, was purposely omitted from assessment and taxation in pursuance of an agreement entered into before April 1, 1891, between the assessors of the several counties, based upon an opinion rendered by the attorney general of the State, advising such omission. That this omission necessarily operated as a discrimination in favor of the other moneyed capital in the hands of individual citizens of the State and against shares of stock of the national banking corporations located within the State, and necessarily resulted in the taxation of the shares of the national banks at a greater rate than other moneyed capital in the hands of the individual citizens of the State.

*Mr. James B. Howe* for plaintiff in error. *Mr. Eugene M. Carr, Mr. Harold Preston* and *Mr. M. T. Cochran* were on his brief.

*Mr. James A. Haight* for defendants in error. *Mr. W. C. Jones* was on his brief.

Mr. Justice Shiras, after stating the case, delivered the opinion of the court.

It is contended on behalf of the plaintiff in error that an assessment and taxation of all the shares of the stock of a national bank *in solido* to the bank direct, as owner thereof, constitutes a tax upon the bank forbidden by section 5219 of the Revised Statutes of the United States.

The tax in question was assessed under section 21 of an act of the legislature of the State of Washington, approved March 9, 1891, Laws of Washington, 1891, pp. 280–289, in the following terms:

"Every individual, firm, corporation or association of persons, carrying on a general banking business in this State, whether the same has been organized under the banking laws of this State or the United States, or conducted under the style of private bankers, shall be assessed and taxed in the county, town, city or village where such bank or banking association is located, and not elsewhere, in the following manner: Annually, at such times as provided for listing property for taxation, every such bank or banking association as contemplated in this section shall, by its accounting officer, furnish the county or city assessor a statement verified by oath giving the amount of paid-up capital stock, the amount of surplus or reserved fund and the amount of undivided profits of such bank or banking association. The aggregate amount of capital, surplus and undivided profits shall be assessed and taxed as other like property in the State is assessed and taxed: *Provided,* At the time of listing the capital stock, the amount and description of its legally authorized investments in real estate shall be assessed and taxed as other real estate is assessed and taxed under this act, and the assessor shall deduct the amount of such investments in real estate from the aggregate amount of such capital, surplus and undivided profits, and the remainder then taxed as above provided."

If this section stood alone there might be ground for the contention that it contemplates taxation of the capital of the bank. But section 23 of the statute provides that "each bank

and banking association shall be liable to pay any taxes assessed against them as the agent of each of its shareholders, owners or owner under the provisions of this act, and may pay the same out of their individual profit account or charge the same to their expense account, or to the accounts of such shareholders, owners or owner in proportion to their ownership."

The Supreme Court of Washington held in this case that these two sections are to be read together, and that, so read, their provisions are not inconsistent with those of the Federal statute.

That the two sections of the state law should be read together is obviously proper, and, at any rate, we are bound by the judgment of the Supreme Court of the State in the mere matter of the construction of that law.

In holding that the state law, in the provisions under consideration, was not in contravention of the Federal statute, the Supreme Court of Washington claimed to follow the case of *National Bank* v. *Commonwealth*, 9 Wall. 353; and we agree with that court in thinking that the case referred to is decisive of the contention now made. In that case it appeared that a statute of the State of Kentucky provided that a tax should be laid on "the bank stock or stock in any moneyed corporation of loan or discount, fifty cents on each share thereof equal to one hundred dollars, or on each one hundred dollars of stock therein owned by individuals, corporations or societies"; and further provided that "the cashier of a bank, whose stock is taxed, shall, on the first day of July in each year, pay into the treasury the amount of tax due. If such tax be not paid, the cashier and his sureties shall be liable for the same and twenty per cent upon the amount."

It was claimed by the bank that the shares of the stock were the property of the individual stockholders, and that the bank could not be made responsible for a tax levied on those shares, and could not be compelled to collect and pay such tax to the State. In delivering the opinion of the court, Mr. Justice Miller said:

"It is strongly urged that it is to be deemed a tax on the

capital of the bank, because the law requires the officers of the bank to pay this tax on the shares of its stockholders. Whether the State has the right to do this we will presently consider, but the fact that it has attempted to do it does not prove that the tax is anything else than a tax on these shares. It has been the practice of many of the States for a long time to require of its corporations thus to pay the tax levied on their shareholders. It is the common, if not the only, mode of doing this in all the New England States, and in several of them the portion of this tax which should properly go as the shareholder's contribution to local or municipal taxation is thus collected by the State of the bank and paid over to the local municipal authorities. In the case of shareholders not residing in the State, it is the only mode in which the State can reach their shares for taxation. We are, therefore, of opinion that the law of Kentucky is a tax upon the shares of the stockholder. . . . A very nice criticism of the proviso to the forty-first section of the National Bank Act"— now section 5219 of the Revised Statutes — "which permits the States to tax the shares of such bank, is made to us to show that the tax must be collected of the shareholder directly, and that the mode we have been considering is by implication forbidden. But we are of opinion that while Congress intended to limit state taxation to the shares of the bank as distinguished from its capital, and to provide against a discrimination in taxing such bank shares unfavorable to them as compared with the shares of other corporations, and with other moneyed capital, it did not intend to prescribe to the States the mode in which the tax should be collected. The mode under consideration is the one which Congress itself has adopted in collecting its tax on dividends and on the income arising from bonds of corporations. It is the only mode which, certainly and without loss, secures the payment of the tax on all the shares, resident or non-resident; and, as we have already stated, it is the mode which experience has justified in the New England States as the most convenient and proper in regard to the numerous wealthy corporations of those States. It is not to be readily inferred, therefore,

that Congress intended to prohibit this mode of collecting a tax which they expressly permitted the States to levy."

This case was followed in *Bell's Gap Railroad* v. *Pennsylvania*, 134 U. S. 232, 239, and *Van Slyke* v. *Wisconsin*, 154 U. S. 581; and its doctrine, that the statutory appointment of the bank to pay the whole tax as agent of the stockholders, is not inconsistent with the Federal law pertaining to national banks, was correctly interpreted and applied by the state court to the case in hand. It was not alleged in the bill, or claimed on argument, that the bank was not in possession of funds, belonging to the stockholders severally, sufficient to pay the tax, proportioned to their ownership of the stock.

It is also contended that the Supreme Court of Washington erred in not holding that the bill of complaint showed that the taxation of the shares of capital stock of the plaintiff was at a greater rate than was assessed upon other moneyed capital in the hands of individual citizens of the State of Washington, and was, therefore, void under section 5219 of the Revised Statutes of the United States.

As the case was disposed of in the court below on a demurrer to the bill, it is proper to have before us the very language of the bill which presents this question, and which was as follows:

"That on the first day of April, 1891, there existed in the county of Chehalis, State of Washington, taxable moneyed capital (other than and beyond that invested in shares of stock of national banks and banking business), owned by citizens of said State, resident in said county and there invested in loans and securities to them payable, and owing by other citizens of said State residing in said county, of vast amount, to wit, exceeding the sum of two hundred and thirty-seven thousand four hundred dollars: That on said first day of April, 1891, there existed in the State of Washington, in counties other than the county of Chehalis aforesaid, other taxable capital in money and moneyed capital (aside from the moneyed capital referred to in the paragraph preceding, and aside from the capital in banks and banking business), owned by citizens of the State of Washington resident in said State (in counties other than the county of Chehalis), and there invested in loans

and securities to them payable and owing by other resident citizens of said State in counties other than the county of Chehalis, of vast amount, to wit, exceeding the sum, as complainant is informed and believes, of fourteen million dollars: That on the said first day of April, 1891, the total capitalization of national banks located in the State of Washington was the sum of seven million dollars; that the total capitalization of banks there located, but incorporated under the laws of the State of Washington, was the sum of four million dollars; and that at the same time large amounts of moneyed capital were invested in the State of Washington by residents of said State in the stocks and bonds of insurance, wharf and gas companies; and in addition to the foregoing there then existed in said State other moneyed capital amounting to at least twenty-six million dollars, being the other moneyed capital hereinbefore referred to; that in no case, as complainant is informed and believes and so charges the fact to be, is the stock of any national bank or the shares of the stock of any national bank located in the State of Washington valued for assessment for taxation in said State at a less sum or assessed upon a value of less than eighty-five per cent of the par value thereof; and, further, that the total assessment and total valuation in the assessment for taxation throughout the State of Washington for the year 1891 of and upon the bonds and shares of banks, banking corporations, insurance, gas, wharf and other corporations, was the sum of eight million two hundred and five thousand five hundred and three dollars.

" That the facts alleged in the preceding paragraphs thereof were then and during all of the times intervening between the first day of April, 1891, and the time of the return of the several assessment rolls throughout the State of Washington by the county assessors to the county auditors, well known to the assessor of the county of Chehalis and all other county assessors throughout the State of Washington, and during all of said times and until the first day of March, 1892, were well known to the several county and state officers hereinbefore referred to, and also to the boards of equalization and boards of county commissioners and the auditor of each of the counties

in said State, and since the first day of March, 1892, have been and are now well known to the defendant, the treasurer of Chehalis County : That on said first day of April, 1891, the entire capital, surplus and undivided profits of complainant were invested as follows, to wit: $12,500.00 bonds of the United States, and the remainder in loans to residents of the State of Washington, in furniture and fixtures; that all of said other moneyed capital referred to in the foregoing paragraphs was purposely omitted from the assessment and from taxation whatsoever by each and every of the county assessors and other taxing officers throughout the State of Washington, and the same and the whole thereof has escaped taxation throughout the State of Washington ; that the omission by the several county assessors and taxing officers of the several counties in said State to either assess or tax other moneyed property or capital last aforesaid was made through, under and by reason and in pursuance of an agreement entered into prior to the first day of April, 1891, between the several county assessors of the several counties in said State, whereby it was agreed upon between them that such omission should be made by them and all of them ; and said omission and agreement to omit was in pursuance of an opinion rendered by the attorney general of the State of Washington to the said several county assessors at their request, advising such omission, the said attorney general being by virtue of his office required by the laws of the State of Washington to render such opinion upon the request of said assessors; that such omission necessarily operated as a discrimination in favor of other moneyed capital in the hands of individual citizens of said State and against shares of stock of national banking corporations located within this State, including complainant, and necessarily resulted in taxation of the shares of such national banks, including complainant, at a greater rate than other moneyed capital in the hands of the individual citizens of said State, all of which was well known to and most wrongfully intended by said several county assessors and taxing officers, and all of which is in direct violation of and forbidden by the provisions of the Revised Statutes hereinbefore specifically referred to."

It is claimed by the plaintiff in error that the withdrawal from taxation of so large a proportion of moneyed capital in the hands of individual citizens, as is shown by these allegations, had the effect of taxing national bank shares at a greater rate than the remaining moneyed capital in the hands of individual citizens was taxed.

Before we consider the legal import of these statements in the complaint, we shall briefly review some of the previous decisions of this court in which similar questions have been dealt with.

In *People* v. *Commissioners*, 4 Wall. 244, the question presented was whether a tax imposed, under a law of the State of New York, on shares of a national bank, was invalid, as a discrimination against the shareholders, because no allowance or deduction was made on account of investments made by the bank in United States bonds, whereas such a deduction or allowance was made in assessments upon insurance companies and individuals. The answer given by this court was that upon a true construction of that clause of the act which provided that taxation of such shares by state authority should not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such States, " the meaning and intent of the lawmakers were that the rate of taxation of the shares should be the same, or not greater than upon the moneyed capital of the individual citizen which is subject or liable to taxation ; that is, no greater proportion or percentage of tax in the valuation of the shares should be levied than upon other moneyed taxable capital in the hands of the citizens." And it was said that " it is known as sound policy that, in every well-regulated and enlightened State or government, certain descriptions of property, and also certain institutions — such as churches, hospitals, academies, cemeteries and the like — are exempt from taxation ; but these exemptions have never been regarded as disturbing the rates of taxation, even where the fundamental law had ordered that it should be uniform."

In *Lionberger* v. *Rouse*, 9 Wall. 468, a shareholder in the Third National Bank of St. Louis resisted payment of a tax

of nearly two per cent on his stock, imposed under a law of
the State of Missouri, because there were in that State two
banks which by a contract the State had, prior to the passage
of the national bank laws, disabled itself from taxing at a
greater rate than one per cent; and it was claimed that the
tax complained of was assessed in disregard of that provision
of the Federal statute which enacted "that the tax so im-
posed, under the laws of any State, upon the shares of any
of the associations authorized by this act, shall not exceed
the rate imposed upon the shares in any of the banks organ-
ized under the authority of the State where such association
is located." Speaking through Mr. Justice Davis, this court
said :

"It is very clear that Congress, in conceding to the States
the right to tax, adopted a measure which it was supposed
would operate to restrain them from legislating adversely to
the interests of the national banks. The measure itself had
reference to prospective legislation by the States, and its
object was accomplished when the States conformed, as far
as practicable, their revenue systems to it. Exact conformity
was required, if attainable, but the law-making power did not
intend such an absurd thing, as that the power of the State
to tax should depend on its doing an act, which it had obliged
itself not to do. It was well known at the time, and Congress
must be supposed to have legislated on this subject with ref-
erence to it, that States, by contracts with individuals or cor-
porations, could grant away the right of taxation, and that
this power had been frequently exercised. It was equally
within the knowledge of Congress that the policy on this sub-
ject varied in different States ; while some of them retained
in their own hands the power of taxation over all species of
property, except such as were devoted to religious or chari-
table purposes, others had parted with it to interests of a
purely business character, like banks and railroads. Can it
be supposed that Congress, in this condition of things in the
country, meant to confer a privilege by one section of a law
which by another it made practically unavailable? If the
construction contended for by the plaintiff in error be allowed,

then a State so unfortunate as to have a single bank, whose shareholders are exempt by contract from taxation in the manner provided by Congress, can derive no benefit from the power to tax the shares of national banks. And this further consequence would follow, that the shareholders of national banks located in one State would escape all taxation, while those whose property was invested in banks in a different locality would have to contribute their full share of the public burdens. This court will not impute to Congress a purpose that would lead to such manifest injustice, in the absence of an express declaration to that effect. Without pursuing the subject further, it is enough to say [that], in our opinion, Congress meant no more by the limitation in the national bank act, than to require of each State, as a condition to the exercise of the power to tax the shares in national banks, that it should, as far as it had the capacity, tax in like manner the shares of banks of issue of its own creation."

By a statute of Pennsylvania of March 31, 1870, all mortgages, judgments, recognizances and moneys owing upon articles of agreement for the sale of real estate were made exempt from taxation except for state purposes. The stock of one Hepburn in the First National Bank of Carlisle, the par value of which was one hundred dollars a share, was subjected, at its market value of one hundred and fifty dollars per share, to taxation for county, school and borough purposes. The validity of such taxation was upheld by the Supreme Court of Pennsylvania, and the case was brought to this court. It was contended on behalf of the shareholder that as, by the Pennsylvania statute, other moneyed capital in the hands of individuals in the county where the bank was located was not subject to taxation for local purposes, such taxes upon shares in a national bank were in the nature of a discrimination and void. It was also contended that in valuing these shares at fifty per cent above par the tax was made fifty per cent greater than on " other moneyed capital in the hands of individuals."

Both these contentions were overruled by this court; and, in disposing of the argument that the taxes in question made

an illegal discrimination against national bank shares, it was said:

"It is next insisted that no municipal or school taxes could be assessed upon the shares of the First National Bank of Carlisle, located within the borough of Carlisle, . . . because by the laws of Pennsylvania, as is claimed, other moneyed capital in the hands of individual citizens at that place is exempt from such taxation. In support of this claim it is shown that all mortgages, judgments, recognizances and moneys owing upon articles of agreement for the sale of real estate are exempt from taxation in that borough except for state purposes. This is a partial exemption only. It was evidently intended to prevent a double burden by the taxation both of property and debts secured upon it. Necessarily there may be other moneyed capital in the locality than such as is exempt. . . . Some part of it only is. It could not have been the intention of Congress to exempt bank shares from taxation because some moneyed capital was exempt. Certainly there is no presumption in favor of such an intention. To have effect it must be manifest. The affirmative of the proposition rests upon him who asserts it. In this case it has not been made to appear." *Hepburn* v. *School Directors*, 23 Wall. 480.

To the same effect was the case of *Adams* v. *Nashville*, 95 U. S. 19.

In *People* v. *Weaver*, 100 U. S. 539, it was held that the statute of a State which establishes a mode of assessment by which shares in a national bank are valued higher in proportion to their real value than other moneyed capital is in conflict with section 5219 of the Revised Statutes, although no greater percentage is levied on such valuation than on that of other moneyed capital; and that the statutes of New York which permit a party to deduct his just debts from the valuation of all his personal property, except so much thereof as consists of such shares, tax them at a greater rate than other moneyed capital, and were, therefore, void as to them.

In *Boyer* v. *Boyer*, 113 U. S. 689, there was brought into question the validity of a county tax levied on national bank shares under a law of the State of Pennsylvania, where other

moneyed capital in the hands of individual citizens within the same taxing district was exempted from such taxation. The previous decisions of the court respecting state taxation of shares in national banks were reviewed, and the conclusion reached was that those decisions did not sustain the proposition that national bank shares may be subjected, under the authority of the State, to local taxation where a very material part, relatively, of other moneyed capital in the hands of individual citizens is exempt. It was observed that "as the act of Congress does not fix a definite limit as to percentage of value, beyond which the States may not tax national bank shares, cases will arise in which it will be difficult to determine whether the exemption of a particular part of moneyed capital in individual hands is so serious or material as to infringe the rule of substantial equality."

That case, like the present one, was determined in the court below on bill and demurrer, and this court thought the better course was to remand the cause with a recommendation that the defendants should be put to answer, so that the facts of the case might be more fully disclosed.

In *Bell's Gap Railroad* v. *Pennsylvania*, 134 U. S. 232, 237, a question was raised, in behalf of citizens of other States, of the validity of a law of the State of Pennsylvania which imposed a tax upon the nominal or face value of corporation bonds, instead of a tax upon their actual value; and, while it was not a case of taxation of national bank stock, some observations were made by Mr. Justice Bradley, in expressing the views of the court, that are applicable to the question before us:

"The provision in the Fourteenth Amendment, that no State shall deny to any person within its jurisdiction the equal protection of the laws, was not intended to prevent a State from adjusting its system of taxation in all proper and reasonable ways. It may, if it chooses, except certain classes of property from any taxation at all, such as churches, libraries and the property of charitable institutions. It may impose different specific taxes upon different trades and professions, and may vary the rates of exercise upon various products; it may tax real estate and personal property in a different man-

ner; it may tax visible property only, and not tax securities for payment of money; it may allow deductions for indebtedness, or not allow them. All such regulations, and those of like character, so long as they proceed within reasonable limits and general usage, are within the discretion of the state legislature, or the people of the State in framing their constitution. But clear and hostile discriminations against particular persons and classes, especially such as are of an unusual character, unknown to the practice of our governments, might be obnoxious to the constitutional prohibition. It would, however, be impracticable and unwise to attempt to lay down any general rule or definition on the subject, that would include all cases. They must be decided as they arise. We think that we are safe in saying that the Fourteenth Amendment was not intended to compel the State to adopt an iron rule of equal taxation. If that were its proper construction it would not only supersede all those constitutional provisions and laws of some of the States, whose object is to secure equality of taxation, and which are usually accompanied with qualifications deemed material; but it would render nugatory those discriminations which the best interests of society require; which are necessary for the encouragement of needed and useful industries, and the discouragement of intemperance and vice; and which every State, in one form or another, deems it expedient to adopt."

*Mercantile Bank* v. *New York*, 121 U. S. 138, was the case of a bill filed by a national bank in the city of New York, the object of which was to restrain the collection of taxes assessed upon its stockholders on the ground that the taxes assessed were illegal and void under section 5219 of the Revised Statutes of the United States, as being at a greater rate than those assessed under the laws of New York upon other moneyed capital in the hands of the individual citizens of that State. From the decree of the Circuit Court of the United States dismissing the bill an appeal was prosecuted to this court.

The question presented was thus stated by Mr. Justice Matthews, who delivered the opinion of this court:

" The proposition which the appellant seeks to establish is that the State of New York, in seeking to tax national bank

shares, has not complied with the condition contained in section 5219 of the Revised Statutes, that such taxation shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State, 'in that it has by its legislation expressly exempted from all taxes in the hands of individual citizens numerous species of moneyed capital, aggregating in actual value the sum of $1,686,000,000, whilst it has by its laws subjected national bank shares in the hands of individual holders thereof (aggregating a par value of $83,000,000) and state bank shares (having a like value of $22,815,700) to taxation upon their full actual value, less only a proportionate amount of real estate owned by the bank.' This exemption, it is claimed, is of a 'very material part relatively' of the whole, and renders the taxation of national bank shares void."

The exemptions referred to were classified as follows : Shares of stock in the hands of the individual shareholders of all incorporated moneyed or stock corporations deriving an income or profit from their capital or otherwise, incorporated by the laws of New York, not including trust companies and life insurance companies, and state or national banks — the value of such shares was admitted to be $755,018,892 ; trust companies and life insurance companies — the value of whose shares was admitted to be $35,558,900 — in addition the life insurance companies owned personal property composed of mortgages, loans and bonds to the amount of $195,257,305 ; savings banks and the deposits therein amounting to $437,107,501, and a surplus of $68,669,001 ; certain municipal bonds, issued by the city of New York under an act passed in 1880, of the value of $13,467,000 ; shares of stock in corporations created by States other than New York, in the hands of individual holders, resident of said State, amounting to $250,000,000.

The contention on behalf of the national bank was that within the doctrine of the case of *Boyer* v. *Boyer*, 113 U. S. 689, these exemptions constituted so material a part relatively of the moneyed capital in the hands of individual citizens as to make the tax upon the shares of national banks an unfair discrimination against that class of property.

On the part of the State it was claimed that the shares of stock in the various companies incorporated by the laws of New York as moneyed or stock corporations, deriving an income or profit from their capital or otherwise, including trust companies, life insurance companies and savings banks, were not moneyed capital in the hands of the individual citizen within the meaning of the act of Congress; that, if any of them are, then the corporations themselves were taxed under the laws of New York in such a manner and to such an extent that the shares of stock therein are in fact subject to a tax equal to that which was assessed upon shares of national banks; and that if there are any exceptions, they were immaterial in amount and based upon considerations which excluded them from the operation of the rule of relative taxation intended by the act of Congress. Upon a careful review of the cases the following conclusions were reached by the court:

"That 'moneyed capital in the hands of individual citizens' does not necessarily embrace shares of stock held by them in *all* corporations whose capital is employed, according to their respective corporate powers and privileges, in business carried on for the pecuniary profit of shareholders, although shares in *some* corporations, according to the nature of their business, may be such moneyed capital. . . . The key to the proper interpretation of the act of Congress is its policy and purpose. The object of the law was to establish a system of national banking institutions, in order to provide a uniform and secure currency for the people, and to facilitate the operations of the Treasury of the United States. The capital of each of the banks in this system was to be furnished entirely by private individuals; but, for the protection of the government and the people, it was required that this capital, so far as it was the security for its circulating notes, should be invested in the bonds of the United States. These bonds were not subjects of taxation; and neither the banks themselves, nor their capital, however invested, nor the shares of stock therein held by individuals, could be taxed by the States in which they were located without the consent of Congress, being exempted from the power of the States in this respect,

because these banks were means and agencies established by Congress in execution of the powers of the government of the United States. It was deemed consistent, however, with these national uses, and otherwise expedient, to grant to the States the authority to tax them within the limits of a rule prescribed by the law. In fixing those limits it became necessary to prohibit the States from imposing such a burden as would prevent the capital of individuals from freely seeking investment in institutions which it was the express object of the law to establish and promote. The business of banking, including all the operations which distinguish it, might be carried on under state laws, either by corporations or private persons, and capital in the form of money might be invested and employed by individual citizens in many single and separate operations forming substantial parts of the business of banking. A tax upon the money of individuals, invested in the form of shares of stock in national banks, would diminish their value as an investment and drive the capital so invested from this employment, if at the same time similar investments and similar employments under the authority of state laws were exempt from an equal burden. The main purpose, therefore, of Congress in fixing limits to state taxation, on investments in the shares of national banks, was to render it impossible for the State, in levying such a tax, to create and foster an unequal and unfriendly competition, by favoring institutions or individuals carrying on a similar business and operations and investments of a like character. The language of the act of Congress is to be read in the light of this policy. Applying this rule of construction, we are led, in the first place, to consider the meaning of the words 'other moneyed capital,' as used in the statute. Of course it includes shares in national banks; the use of the word 'other' requires that. If bank shares were not 'moneyed capital,' the word 'other' in this connection would be without significance. But 'moneyed capital' does not mean all capital the value of which is measured in terms of money. In this sense, all kinds of real and personal property would be embraced by it, for they all have an estimated

value as the subjects of sale.    Neither does it necessarily include all forms of investment in which the interest of the owner is expressed in money.    Shares of stock in railroad companies, mining companies, manufacturing companies and other corporations are represented by certificates showing that the owner is entitled to an interest, expressed in money value, in the entire capital and property of the corporation, but the property of the corporation which constitutes its invested capital may consist mainly of real and personal property, which, in the hands of individuals, no one would think of calling 'moneyed capital,' and its business may not consist in any kind of dealing in money, or commercial representatives of money.    So far as the policy of the government in reference to national banks is concerned, it is indifferent how the States may choose to tax such corporations as those just mentioned, or the interest of individuals in them, or whether they should be taxed at all.    Whether property interests in railroads, in manufacturing enterprises, in mining investments and others of that description are taxed or exempt from taxation, in the contemplation of the law, would have no effect upon the success of national banks.    There is no reason, therefore, to suppose that Congress intended, in respect to these matters, to interfere with the power and policy of the States. The business of banking, as defined by law and custom, consists in the issue of notes payable on demand, intended to circulate as money where the banks are banks of issue; in receiving deposits payable on demand; in discounting commercial paper; making loans of money on collateral security; buying and selling bills of exchange; negotiating loans, and dealing in negotiable securities issued by the government, state and national, and municipal and other corporations.    These are the operations in which the capital invested in national banks is employed, and it is the nature of that employment which constitutes it in the eye of this statute 'moneyed capital.' Corporations and individuals carrying on these operations do come into competition with the business of national banks, and capital in the hands of individuals thus employed is what is intended to be described by the act of Congress.

"That the words of the law must be so limited appears from another consideration; they do not embrace any moneyed capital in the sense just defined, except that in the hands of individual citizens. This excludes moneyed capital in the hands of corporations, although the business of some corporations may be such as to make the shares therein belonging to individuals moneyed capital in their hands, as in the case of banks. A railroad company, a mining company, an insurance company, or any other corporation of that description, may have a large part of its capital invested in securities payable in money, and so may be the owners of moneyed capital; but, as we have seen, the shares of stock in such companies held by individuals are not moneyed capital.

"The terms of the act of Congress, therefore, include shares of stock or other interests owned by individuals in all enterprises in which the capital employed in carrying on its business is money, where the object of the business is the making of profit by its use as money. The moneyed capital thus employed is invested for that purpose in securities by way of loan, discount, or otherwise, which are from time to time, according to the rules of the business, reduced again to money and reinvested. It includes money in the hands of individuals employed in a similar way, invested in loans, or in securities for the payment of money, either as an investment of a permanent character, or temporarily with a view to sale or repayment and reinvestment. In this way the moneyed capital in the hands of individuals is distinguished from what is known generally as personal property. Accordingly, it was said in *Evansville Bank* v. *Britton*, 105 U. S. 322: 'The act of Congress does not make the tax on personal property the measure of the tax on the bank shares in the State, but the tax on moneyed capital in the hands of the individual citizens. Credits, moneys loaned at interest, and demands against persons or corporations, are more purely representative of moneyed capital than personal property, so far as they can be said to differ. Undoubtedly, there may be said to be much personal property exempt from taxation without giving bank shares a right to similar exemption, because personal prop-

erty is not necessarily moneyed capital. But the rights, credits, demands and money at interest mentioned in the Indiana statute, from which *bona fide* debts may be deducted, all mean moneyed capital invested in that way.'"

In respect to trust companies the court held that it was evident, from the powers granted them in the legislation of New York, that they were not banks in the commercial sense of that word, and did not perform the function of banks in carrying on the exchanges of commerce, and that, taxed as they were, on their franchises based on income, it could not be said that there existed any discrimination against national banks. As to savings banks it was held that, though it could not be denied that their deposits constituted moneyed capital in the hands of individuals, yet it was clear that they were not within the meaning of the act of. Congress in such a sense as to require that, if they are exempted from taxation, shares of stock in national banks must also be exempted; that it was part of the policy of the State to encourage the accumulation of small savings belonging to the industrious and thrifty, and it was within the reasonable exercise of the power of the State to exempt particular kinds of property, and the conclusion of the court, in respect to savings banks, was thus expressed: "The only limitation, upon deliberate reflection, we now think it necessary to add, is that these exceptions should be founded on just reason, and not operate as an unfriendly discrimination against investments in national bank shares. However large, therefore, may be the amount of moneyed capital in the hands of individuals, in the shape of deposits in savings banks as now organized, which the policy of the State exempts from taxation for its own purposes, that exemption cannot affect the rule for the taxation of shares in national banks, provided they are taxed at a rate not greater than other moneyed capital in the hands of individual citizens otherwise subject to taxation."

The conclusions to be deduced from these decisions are that money invested in corporations or in individual enterprises that carry on the business of railroads, of manufacturing enterprises, mining investments and investments in mortgages,

does not come into competition with the business of national banks, and is not therefore within the meaning of the act of Congress; that such stocks as those in insurance companies may be legitimately taxed on income instead of on value, because such companies are not competitors for business with national banks; and that exemptions, however large, of deposits in savings banks, or of moneys belonging to charitable institutions, if exempted for reasons of public policy and not as an unfriendly discrimination against investments in national bank shares, should not be regarded as forbidden by section 5219 of the Revised Statutes of the United States.

We shall now, in the light of the previous decisions, advert to the allegations contained in the bill of complaint.

The substance of those allegations is : First, that there was taxable moneyed capital in Chehalis County, which escaped taxation, amounting to $237,400; second, that there was also unassessed moneyed capital in other portions of the State exceeding $14,000,000; third, that the moneyed capital invested in banks, national and state, was $11,000,000; fourth, that there was invested in the stocks and bonds of insurance, wharf and gas companies and other moneyed institutions, moneyed capital amounting to at least $26,000,000.

Even if it be conceded that the stocks and bonds of insurance, wharf and gas companies were, in point of fact, exempted from taxation, such companies are not, as we have seen, competitors for business with the national banks, and, therefore, might be legally exempted. As to the sum of $237,400, alleged to be invested by individual citizens of Chehalis County in loans and securities to them payable and owing by other citizens of that county, we are not informed by the bill of the nature of such loans and securities, and, as against the pleader, we may well assume that they belong to a class of investments which does not compete with the business of national banks. The same is true of the sum of $14,000,000 alleged to be invested in loans and securities by citizens of the State of Washington and to them payable and owing by other citizens of said State.

It is, indeed, alleged in the bill that these investments were " taxable capital," but that is an averment in the nature of a

legal conclusion. If those loans and securities had been identified in the bill, or their character described, the court might have reached a different conclusion as to their taxable character.

There is an allegation in the bill that the omission by the taxing officers of these classes of capital from assessment and taxation was in pursuance of an opinion rendered by the attorney general of the State of Washington; and it is alleged that the said attorney general was required by the laws of the State to render opinions upon request of the assessors. But the bill does not set forth that opinion, or the reasons upon which the attorney general proceeded. The Supreme Court of the State of Washington, adverting to this allegation of the bill, suggests that it is probable that the opinion referred to was one dated February 5, 1891, addressed to the state auditor, and in which the attorney general advised that accounts, promissory notes and mortgages were to be exempted, in order, perhaps, to avoid double taxation. And the Supreme Court well observes that if the action of the assessors was based upon this decision of the law officer of the State, and went no further, the allegations of the bill would certainly turn out to be unsupported. 6 Washington, 64.

We agree with the Supreme Court of Washington in thinking that the allegations of this complaint nowhere show that any moneyed capital of the character defined by the Federal Supreme Court was omitted or intended to be omitted by the assessors; or if the intention of the complaint be to cover any such existing cases, the allegations are so general and indefinite that they cannot be made the basis of action.

The judgment of the Supreme Court of Washington is

*Affirmed.*

Mr. Justice Harlan, Mr. Justice Brown and Mr. Justice White are of opinion that the bill makes a *prima facie* case of illegal discrimination against capital invested in national bank stock, and, therefore, that the demurrer should have been overruled.