## NATIONAL BANK OF BALTIMORE v. MAYOR, ETC., OF BALTIMORE et al.

(Circuit Court of Appeals, Fourth Circuit. February 24, 1900.)

No. 333.

1. TAXATION—NATIONAL BANK SHARES—DISCRIMINATION.

The term "moneyed capital" is used in a restricted sense in Rev. St. § 5219, providing that the taxation of the shares of national banks shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individuals; and what constitutes moneyed capital, within the meaning of that section, is to be determined by the nature of the business in which it is employed, the purpose of the statute being to prevent discrimination against national banks as such. Where capital is not so employed as to come into competition with the business of national banks, although in a general sense it is moneyed capital, it is within the discretion of the state to tax it at a different rate from banking capital.

2. SAME—MARYLAND STATUTE.

The fact that bonds and evidences of debt of public or private corporations, and shares of stock in foreign corporations, owned by residents of Maryland, cannot be taxed for county or city purposes, under Code Pub. Gen. Laws Md. art. 81, § 201 (Laws 1896, c. 143), at a higher rate than 30 cents on each $100 of valuation, does not render the taxation of national bank shares for city purposes at a higher rate illegal under Rev. St. § 5219, prohibiting the taxation of such shares at a higher rate than other moneyed capital in the hands of individuals, the capital of all domestic banking and other corporations being subject to taxation at the same rate, and it not appearing that the statute, in its practical operation, resulted in relieving the capital of private banking firms from equal taxation.

Appeal from the Circuit Court of the United States for the District of Maryland.

Bernard Carter and George R. Gaither, Jr. (Willis & Homer, on the brief), for appellant.

John V. L. Findlay and Leon E. Greenbaum, for appellees.

Before SIMONTON, Circuit Judge, and PAUL and BRAWLEY, District Judges.

BRAWLEY, District Judge. The National Bank of Baltimore filed its bill in the circuit court of the United States for the district of Maryland, complaining that certain legislation of the state of Maryland, relating to the valuation and assessment for taxation of certain classes of personal property, was obnoxious to the provisions of section 5219 of the Revised Statutes of the United States, and, having tendered the amount which it claimed was all that was justly

due, injunction was prayed to restrain the mayor and city council of Baltimore and its tax collector from collecting the amount charged against it in unfair discrimination. The injunction was refused, the bill dismissed, and the case is here on appeal. (C. C.) 92 Fed. 239.

By the laws of Maryland, all the shares in national banks in the city of Baltimore are, for the purposes of state, county, and municipal taxation, required to be assessed and valued at their actual cash value. The bank makes its return annually to the tax commissioner, reporting, among other things, the prices at which any sales of its stock have been made during the year; and after deducting from its list of securities any which by law are exempt from taxation, and its real estate, which is separately taxed, the actual market value of the whole of the capital stock, less such deductions, is charged against the bank, which pays for all of its resident shareholders at such a rate of taxation as is fixed each year for city purposes by the mayor and city council of Baltimore. Such rate for the year 1897 was $2 on every $100 of the assessed value of all property within the city limits, except in certain territory annexed since 1888, wherein, by virtue of the act of assembly of that year, the rate of taxation was fixed at not exceeding 60 cents on every $100 of taxable property for a term of years, which expires in 1900. The shares of the complainant bank were assessed, for the purposes of state, county, and city taxation for the year 1897, at $112.34 per share; their book value for that year being about $140 per share. The bill charges that by the act of assembly of Maryland of 1896, c. 143, a new section, to be designated as section 201, was added to article 81 of the Code of Public General Laws of Maryland. It is this section which gives rise to the controversy. It is as follows:

"Sec. 201. (1) All bonds, certificates of indebtedness, or evidences of debt, in whatsoever form made or issued by any public or private corporation incorporated by this state or any other state, territory, district or foreign country, or issued by any state (except the state of Maryland), territory, district or foreign country, not exempt from taxation by the laws of this state, and owned by residents of Maryland, shall be subject to valuation and assessment to the owner thereof in the county or city in which such owners may respectively reside, and they shall be assessed at their actual value in the market, and such upon which no interest shall be actually paid, shall not be valued at all, and there shall be paid upon such valuation thirty cents (and no more) on each one hundred dollars for county, city and municipal taxation in such county or city of this state in which the owner may reside. (2) All shares of stock or shares in any bank, other than a national bank, or in any company or corporation incorporated by or located in and doing business in any other state, or District of Columbia, or in any territory or foreign country, owned by residents of this state, shall be valued and assessed for the purpose of state, county and municipal taxation to the owners thereof in the county or city in which such owners may reside, and said shares shall be assessed and valued at their actual value in the market and those upon which no dividend shall be actually paid, shall not be valued at all, and upon the valuation so made the regular rate of taxation for state purposes shall be paid, and there shall also be paid on such valuation thirty cents (and no more) on each hundred dollars for county, city and municipal taxation in such county or city of this state in which the owners may reside."

Section 194, c. 120, of the same act of 1896, provided for the valuation and assessment of all bonds, certificates of indebtedness, or evi-

dences of debt upon a sliding scale, according to the rate of interest therein stipulated to be paid, those bearing interest at 6 per centum to be assessed at 50 per centum of their face value, those bearing interest at 5 per centum to be assessed at 41⅔ per centum of their face value, and so on, the rate of assessment diminishing in proportion to the lowering of the rate of interest. This section was brought to the attention of the court by way of amendment, which alleged that section 194, so far as it relates to bonds, certificates of indebtedness, or evidences of debt, made or issued by corporations or by states, etc., was repealed by chapter 143, above cited, but that the same, so far as it relates to certificates of indebtedness issued by any individual or firm, is still in force and operation. To this amendment the defendants demurred, and the demurrer was sustained.

Sections 143 and 194 both provide for a mode of valuation and assessment of certain kinds of personal property at a different and lower valuation than that of national bank stock, and, in the view of the complainant, either is equally obnoxious. The main contention being over section 201, further reference to section 194 does not seem to be necessary. The sole question is whether the scheme of valuation and assessment of the property and credits therein specified, which provides that no more than 30 cents on each $100 of valuation thereof shall be paid for state, county, and municipal taxation, while the shares of national banks are taxed for municipal purposes at the rate of $2 upon every $100 of valuation, is in accord with the restriction embodied in section 5219 of the Revised Statutes of the United States, providing that the taxation of such shares "shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individuals." If the subjects of taxation enumerated in section 201 are "moneyed capital," within the purview of section 5219 of the Revised Statutes, it would follow as of course that the complainants are entitled to the relief sought, for it is only by virtue of said section that the states or municipalities have the right to tax national bank shares at all, and any such taxation must be in accordance with the limitations therein prescribed.

It is not contended that the legislation in question was inspired by any sentiment of hostility to the national banks, or that there was any intention to make an unjust discrimination against them, but it is claimed that in the practical operation of this system of taxation an unjust discrimination, obnoxious to section 5219, is effected; the main contention being that certain private bankers, whose business is competitive with the national banks, by investing their capital in the securities mentioned in section 201, which are valued and assessed at 30 cents on the $100, have thereby an advantage over the national banks, whose shares are subject to taxation at the rate of $2 upon the $100 of their valuation. The shares of all incorporated banks and trust companies in Baltimore are assessed in like manner with the shares of the national banks, and are taxed upon the same valuation, and there is no claim that there is any discrimination in their favor.

An examination of the tax laws of the state of Maryland shows a plain intention to bring within the range of taxation every kind and

description of property, real and personal. Deposits' in savings banks, which, in most of the states, are from motives of public policy exempted, are taxed at one-fourth of 1 per cent., and, after the enumeration of the many and various subjects of taxation, Act 1896, c. 120, provides that "all other property of every kind, nature and description within this state, except as provided by the fourth section of this article, shall be valued and assessed for the purpose of state, county and municipal taxation to the respective owners thereof, in the manner prescribed by this article." Inasmuch as every other kind of property, including shares in every kind of corporation, is valued, assessed, and taxed at the same rate as are shares of national banks,—that is to say, at the rate $2 on every $100,—it is manifest that the scheme of valuation and assessment provided in section 201 is due to some other cause than to a desire to discriminate in favor of the kind of property embraced in that section. It is not difficult to find from the testimony in this case and in our knowledge of human nature the reasons for this discrimination.

The taxation of personal property has always and everywhere been a vexatious problem. Horses and cattle, wagons and carriages, the implements of husbandry and household furniture,—all things, in fact, which are visible, and cannot readily be concealed, including therein shares in incorporated companies, which may be compelled by the law creating them to make returns,—are within comparatively easy reach of the tax assessors. But the great mass of personal property, in which the wealth of a country is invested, consisting of bonds and other evidences of credit, which can be readily hidden, escape the eye of the assessor, and nothing is more conclusively settled by human experience than that it is impossible to collect taxes upon this kind of property with any reasonable approach to accuracy or equality, and this is not for want of long-sustained and earnest effort to accomplish it. There is a monotonous uniformity in the reports of the failures of every system attempted, however stringent may be the legislation, or however arbitrary or despotic may be the powers with which the assessors may be clothed. The heavy hand of the tax-gatherer always falls upon the widow and the orphan, upon trustees and guardians, whose estates are required by law to be revealed to the courts of probate, and upon those only whose consciences are unusually scrupulous, and who, having least experience in business, are least able to bear the burden, while the most inadequate returns are invariably made by the rich, who are usually most ingenious in evasion, and most fertile in expedients to escape taxation. The result is that always and everywhere no appreciable part of such intangible property is reached by laws, however ingeniously framed or severely enforced. The heavy and ever-increasing rate of taxation in our cities makes this result inevitable. Safe investments are rarely found which yield more than 4 per cent., and, the rate of taxation being generally from 2 to 3 per cent., it is not to be wondered at that there should be endeavor to escape a burden which takes more than half of their income. Evasion and downright perjury is the consequence. The legislation complained of is the outgrowth of this state of things, which is not peculiar to the state of Maryland,

but. the lawmakers of that state, having in view that trait of human nature which impels the man of average honesty to be in matters of taxation about as honest as he thinks he can afford to be, have endeavored to bring hoarded wealth from its hiding, by the promise of taxation at a rate which would not be practically confiscatory, with the result that over $50,000,000 of property has been returned for taxation which had never before been brought to light. The exact figures are that before the passage of this act $6,481,047 was returned, the greater part of this amount belonging to trust estates, while in the year following $58,885,000 was returned for taxation; and the precise question now presented for determination is whether the valuation of this property for purposes of taxation at 30 cents on the $100 works such a discrimination against national banks that the courts should be compelled to declare this legislation void, as obnoxious to the provisions of the statute of the United States intended to prevent hostile discrimination against national banks.

It is obvious, from examination of the whole scheme of taxation of which section 201 is part, that it was inspired by no spirit of hostility to the national banks, or to corporations generally; for the state banks and trust companies, which do a business similar to that of the national banks, are on precisely the same plane with them, and all corporations chartered by the state of Maryland are assessed at the same rate. That bonds and other evidences of debt are in a certain sense moneyed capital can hardly be disputed, for any money invested in commercial or manufacturing enterprises is in one sense moneyed capital. A lawyer's investment in his books, a mechanic's investment in his tools, represent capital which is measurable in terms of money; but obviously the congress, if it had intended to include in its inhibition all capital in form of investment, would have used some such comprehensive term as "personal property," and it must be assumed that the words "other moneyed capital" were employed deliberately, to denote more restricted forms of invested capital. It seems to be the plain intention of this proviso to protect the corporations formed under the authority of congress from unfriendly discriminations that would come from the taxing powers of the states being exerted in such a way as would enable their citizens, engaged in like business, to compete with the national banks upon unfair and unequal terms. Any legislation which prescribed a lower rate of taxation upon moneyed capital in the hands of individuals than that imposed upon the moneyed capital of the banks would clearly fall within the inhibition, and it would be equally obnoxious, whether this result was accomplished indirectly or directly. If the legislation complained of was framed with the intent or if its necessary consequence is to foster such unequal competition, then it must fall under condemnation; for, the right of the state to tax these shares at all being given by congress, it must be exercised in accordance with the limitation prescribed, which in terms provides that such taxation shall not be at "a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state." It is equality of assessment with other moneyed capital that is sought to be attained by this proviso, not equality with personal property gen-

erally. Railroad companies, manufacturing or mining companies, and the various commercial enterprizes in which capital is employed, are not within the contemplation of the proviso; for they do not come into competition with national banks, and congress does not undertake to prescribe methods or limitations upon the taxation of such property.

The words "moneyed capital" not having been defined by the statute, it has been left to the courts to interpret them, and they have been so frequently considered by the supreme court of the United States that there is little difficulty in ascertaining what that court construes them to mean. The leading case is Mercantile Nat. Bank v. City of New York, 121 U. S. 157, 7 Sup. Ct. 826, 30 L. Ed. 895, and the last case is First Nat. Bank of Aberdeen v. Chehalis Co., 166 U. S. 440, 17 Sup. Ct. 629, 41 L. Ed. 1069. In these two will be found a review of nearly all of the decisions. It would serve no good purpose to restate them. The result of them all is that "moneyed capital" has been given a restricted meaning. It is the nature of the employment that fixes its character. Wherever money is employed in the carrying on of a business, the object of which is the making of profit by its use as money, it is moneyed capital. When such capital is invested in loans or securities of a permanent or temporary character, if it is so invested with a view to sale and reinvestment for the purpose of making money by the operation, it is moneyed capital. The securities themselves do not necessarily come within the definition. In other words, moneyed capital is the tool or instrument; bonds and other securities are the material in and with which it operates.

The policy and purpose of congress was to protect the instrumentalities created by it from unfair competition, by requiring that all persons engaged in like business should pay upon the capital so employed a like and equal rate of taxation. The true test is the nature of the business in which the person is engaged, and that cannot be determined by the character of the investment. Moneyed capital does not mean all capital the value of which is measured in terms of money. It has been held that stocks and bonds of insurance, wharf, gas, and other miscellaneous corporations might be entirely exempted from taxation, although such companies may be engaged in business for the pecuniary profit of their shareholders, and employ moneyed capital in their operations, because, from the nature of their business, they are not competitors with the national banks. So, too, municipal bonds may be exempted altogether from taxation, because they are not within the reason of the rule established by congress for the taxation of national bank shares, and the tax on personal property generally is not the measure of the tax on shares of national banks. The exemption from taxation of savings banks has been sustained, although it seems clear that deposits are moneyed capital, because it has been held that their business does not come into competition with national banks, and because it is the obvious interest and policy of the states to promote their growth. The specific function of the national bank, as declared by subdivision 7 of section 5136 of the Revised Statutes, is as follows:

"To exercise by its board of directors, or duly authorized officers or agents, subject to law all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing and circulating notes according to the provisions of this title."

The business of banking, as defined by Mr. Justice Matthews in the Mercantile Nat. Bank Case, supra, is of somewhat wider scope. It is as follows:

"The business of banking, as defined by law and custom, consists in the issue of notes, payable on demand, intended to circulate as money, where the banks are banks of issue; in receiving deposits payable on demand; in discounting commercial paper; making loans on collateral security; buying and selling bills of exchange; negotiating loans; and dealing in negotiable securities issued by the government, state and national, and municipal and other corporations."

It will be observed that the "dealing in negotiable securities" is not one of the functions of the national bank prescribed by the law of its creation. · That is commonly considered the business of a broker, but we are not required in this case to determine whether or not it is the proper business of a national bank.

The law is well settled that any legislation which imposes a lower rate of taxation upon the capital of individuals engaged in the banking business, as above defined, than is imposed upon national banks, is obnoxious to section 5219. Whether the tax law of Maryland is of that character must now be determined. The section complained of has already been cited. It provides, in substance, that all bonds, certificates of indebtedness, or evidences of debt, and all shares of stock in any bank or other corporation incorporated by any other state, owned by residents of Maryland, shall be valued and assessed at their actual value in the market, and that taxes shall be paid on such valuation at the rate of 30 cents on each $100. This section does not provide, nor purport to provide, either method of valuation or rate of taxation upon the capital of individuals engaged in the banking business. Its purpose, and its only purpose, was to bring within ·the range of a moderate taxation property which theretofore escaped all taxation. If this section is stricken out, will the national banks be in any better plight? Would it follow that the capital of the firms of private bankers, which it is claimed eludes an equal share with them in the burden of taxation, could be brought within the reach of the tax assessor by its annulment?

The competition claimed to be injurious arises, it is alleged, in two ways—First, by the sending to Baltimore to be loaned large sums of money by corporations and companies outside of the state, the local holders of whose shares are taxed, by subdivision 2 of section 201, only at the rate of 30 cents upon the $100 of their holdings. How much of such foreign capital is brought to Baltimore, and to what extent and how such corporations are taxed in the states where they are incorporated, the record does not show. It does not seem possible that the taxing or the nontaxing of Maryland shareholders of such corporations can have any effect upon such competition, and it seems to be entirely within the competence of the state to omit altogether

from its list of subjects of taxation the holdings of its citizens in foreign corporations, as the property of such corporations is generally taxed in the situs of their creation, and other taxation is double taxation.

There is in the world a large amount of accumulated capital seeking investment,—a loan fund, national and international, which goes where it is wanted, as mobile as the beads of quicksilver. It eludes taxation everywhere, yet no community would willingly erect barriers against its coming. It is governed by no law except the law of supply and demand, and taxation to the point of confiscation of the shares of citizens of Baltimore in foreign corporations would be utterly futile to prevent such competition, if the local conditions in that city promised a profitable return upon such capital.

The second ground of contention is that private bankers in Baltimore, by investing their capital in the bonds, certificates of indebtedness, and evidences of debt described in subdivision 1 of section 201, upon which they are taxed at the rate of 30 cents upon $100, are thereby enabled to compete unfairly with the national banks. If that is satisfactorily proved, it would seem that the contention is meritorious. An examination of the record will disclose how far the contention is maintained. These firms of private bankers not being incorporated, it is impossible for us to ascertain what amount of capital is employed by them in the banking business which is competitive with the national banks. It appears from the testimony that these firms are also brokers and promoters. The testimony of the complainant is that, by reports of commercial agencies, the aggregate capital of these firms is about $10,000,000. These reports have not been verified by any proof, and therefore can have little weight as evidence of the fact. We are left entirely in the dark as to how much of this supposed capital is invested in government bonds, which are not taxable, and how much is invested in real estate and in the shares of local corporations, which are fully taxed, and how much is merely supposititious; for it is not an unheard of thing for men to get credit for capital which they do not possess. And we are equally unenlightened as to the amount of capital returned by these private bankers for taxation. One of them, examined by the complainant, testified that he made no returns of his capital as capital, but he was not interrogated as to the amount of his capital; and he further testified that a great part of his business was in stocks of domestic corporations, which were fully taxed, and that he paid at the rate of 30 cents on the bonds held at the time of assessment. One of the bankers examined by the defendants testified that his firm made full returns of its capital, and paid the full tax of $2 on the $100 thereon, and there was testimony that another firm did the same thing. The tax collector of the city of Baltimore testified that he did not know of any capital employed in the banking business that did not pay at the regular local rate, and that after this investigation was begun he summoned before him the bankers who were mentioned in the testimony for the complainant as paying only at the rate of 30 cents on the $100 on certain securities, and not upon capital, and, after a hearing and upon affidavits submitted, "he was fully satisfied that

they were paying on their capital at the regular city rate." He says: "I felt satisfied that the correct assessments were being made."

Whatever may be the fact, the record fails to sustain the contention of the complainant that the capital of private bankers, employed in the banking business, in competition with the national banks, is taxed at a lower rate than is the capital of such banks. That was the conclusion of the careful and learned district judge who heard the case below. His conclusions on questions of fact are justly entitled to great weight, and our examination of the testimony leads us to entire agreement with him, although, on first impression, there seemed ground for suspicion, at least, that much private capital escaped its full share of taxation, arising somewhat from the circumstance that it does not appear that in the tax laws of Maryland there is any provision for the taxation of such capital eo nomine. It is asserted by the defendant that such capital is returnable for taxation under the clause of the tax law of 1896 which is as follows:

"All other property of every kind, nature and description within this state, except as provided by the fourth section of this article, shall be valued and assessed for the purpose of state, county and municipal taxation to the respective owners thereof in the manner prescribed by this article."

However that may be, we have the proof that some of the capital of private bankers is returned and taxed at the full rate, and no sufficient proof that any material portion of such taxable capital is not returned. If there is an omission to assess and tax such capital at full rates, such omission is in no wise due to section 201, which does not relate to that subject, and annulment of that section would not remedy the evil complained of; for, as already stated, the design and effect of that section was to put upon the tax books a large amount of property, in the shape of invested capital, which before the passage of this act was not taxed at all.

There is nothing in the statutes of the United States relating to national banks which inhibits the states from differential taxation generally. State policy may legitimately dictate different modes and rates of taxation. It may foster some interests, and discourage others, by diversity in rates of taxation. If unrestrained by its own constitution, it may exempt altogether certain kinds of property for the purpose of building up manufacturing industries. As Mr. Justice Bradley says in Bell's Gap R. Co. v. Pennsylvania, 134 U. S. 232, 10 Sup. Ct. 533, 33 L. Ed. 892, in a case arising under the fourteenth amendment, which forbids the denying of the equal protection of the laws:

"It may, if it chooses, exempt certain classes of property from any taxation at all, such as churches, libraries, and the property of charitable institutions. It may impose different specific taxes upon different trades and professions, and may vary the rates of excise upon various products. It may tax real and personal property in a different manner. It may tax visible property only, and not tax securities for the payment of money. It may allow deductions for indebtedness or not allow them. * * * But clear and hostile discriminations against particular persons and classes, especially such as are of an unusual character, unknown to the practice of our governments, might be obnoxious to the constitutional prohibition."

A law fair on its face might be administered with an evil eye and unequal hand, moved by prejudice or favoritism or other improper

motives difficult of detection, so as to make an unjust and illegal discrimination; but there is no allegation or proof in this case that the assessing officers have failed to perform their whole duty, and the bill of complaint is not based upon any dereliction of duty on their part.

There are many difficulties inherent in the nature of the subject which prevent the ascertainment with absolute certainty of the amount of taxable moneyed capital employed by private bankers and brokers in the operations in which they are engaged. It is within common knowledge that a great deal of business is done by such bankers with borrowed capital. The complainant bank itself furnishes an illustration. With a capital of $1,210,700, its loans and discounts, as appear by its last report, amount to $2,116,442.47. Properly enough, it makes no return of, and is not taxed upon, the securities in which its money is invested. It is taxed only upon its capital stock. It is quite within the range of possibility, if not of probability, that some of the private firms of bankers, the integrity of whose returns is impeached at least by implication, may be conducting very large operations in the securities in question upon borrowed money and with very little of their own capital. That might well be the case with bankers in good credit, and known to be possessed of large means; for the very essence of good banking is to make money for yourself by using the money of other people.

That there should be $10,000,000 of taxable moneyed capital within easy reach of the all-devouring maw of the municipal taxgatherer, justly liable to a tax of $2 upon every $100, which escapes by the payment of 30 cents upon the $100, is a proposition which requires proof to sustain it. No court could predicate a judgment upon such a violent presumption, in face of the positive testimony of the officer whose duty it is to assess, and whose character and capacity is unimpeached, that all such capital is correctly assessed, and that the full city rate is paid thereon. All that can be fairly claimed by the complainant is that some of these bankers do not make returns of their capital, because the law does not specifically require it, and that some moneyed capital thereby escapes the full rate of taxation. How much of this capital thus escapes we have no means of determining. The fact that some property escapes taxation, not shown to be an appreciable portion of the whole, furnishes no ground for relief. In Hepburn v. School Directors, 23 Wall. 480, 23 L. Ed. 112, it was contended that no municipal taxes could be collected upon shares of the national bank, because by the laws of Pennsylvania other moneyed capital in the hands of individual citizens was exempt from taxation; and it was shown that in the borough of Carlisle, where the bank was located, all mortgages, judgments, recognizances, and moneys owing upon articles of agreement for the sale of real estate were exempt from taxation, except for state purposes. Says Chief Justice Waite: "It could not have been the intention of congress to exempt bank shares from taxation because some moneyed capital was exempt; certainly there is no presumption in favor of such an intention. To have effect, it must be manifest." The decree of the circuit court is affirmed.