## In re ASSESSMENT OF FIRST NAT. BANK OF CHICKASHA.

No. 7912. Opinion Filed October 10, 1916.

(160 Pac. 469.)

1. TAXATION—Property Subject—Exemptions—Power of Legislature. The power to exempt from taxation, as well as that of taxation, is an essential attribute of sovereignty. Generally, the power to make exemptions is included or involved in the right to apportion taxes, and exists in the supreme legislative power, unless expressly forbidden by constitutional limitation.

2. SAME—"Property"—State Bonds. Section 50, art. 5, of the Constitution, prohibiting the Legislature from passing laws exempting any property within the state from taxation, except such as is named in section 6, art. 10, was not intended to prohibit the Legislature from exempting from taxation the bonds of the state, issued in aid of its governmental functions. Such bonds being instrumentalities of government, do not constitute property within the meaning of the constitutional limitation against exempting property from taxation.

3.  **SAME—Exemptions—Constitutional and Statutory Provisions.**
    There being no constitutional obstruction forbidding the Legisla-
    ture from exempting from taxation the bonded indebtedness of
    the state, in the form of the state public building bonds, it
    follows, necessarily, that the act exempting said bonds from
    taxation is not, in that respect, unconstitutional.

4.  **SAME—Property Subject—Stock in National Banks.** The taxa-
    tion of shares of stock in national banks is permitted by Act
    Cong. June 3, 1864, c. 106, 13 Stat. 111, as amended by Act Feb. 10,
    1868, c. 7, 15 Stat. 34 (Rev. St. U. S. sec. 5219 [U. S. Comp. St.
    1913, sec. 9748]), provided they are taxed in the city or town
    where the bank is located, and at no greater rate than is assessed
    upon other moneyed capital in the hands of individual citizens
    of the state.

5.  **SAME—State Bonds—Power of Legislature.** The statutory rule
    that the rate of taxation upon the shares in a national bank
    should be the same or not greater than upon the moneyed capital
    of the individual citizen which is liable to taxation, was not
    intended to cut off the power of the Legislature to exempt bonds
    of the state from taxation.

6.  **SAME—Exemptions—Power of Legislature—State Public Build-
    ing Bonds.** The issuance and sale of state public building bonds,
    authorized by chapter 89 of the act of the Legislature approved
    March 15, 1911 (Sess. Laws 1911, pp. 194-199), by which the
    state was enabled to raise money to accomplish and carry out a
    governmental purpose, and to the payment of which the good
    faith of the state was solemnly pledged, was an exercise of
    sovereignty, of the borrowing power, a use of the state's credit.
    And the bonds issued to enable the state to discharge its public
    functions are instrumentalities of government. They constitute
    the means resorted to by the state to effectuate the powers of
    government.

7.  **SAME.** The intention of the Legislature to exempt the bonds
    from taxation being indubitable, the right to tax such bonds,
    whether directly or in legal effect, can be exercised under no
    circumstances, and is not therefore dependent upon the character
    of the owner or the statute under which the tax is assessed.

8.  **CONSTITUTIONAL LAW—Impairing Obligation of Contract—
    State Building Bonds.** State public building bonds issued and
    sold pursuant to the act of March 15, 1911, and which by the
    terms of the act, as well as by express recital in the bonds, are
    made nontaxable, constitute a binding contract between the holder
    of such bonds and the state, which the latter under the guise of
    taxation may not constitutionally impair.

9.  **SAME—Impairing Obligation of Contract—Taxation.** The con-
    stitutional inhibitions, both state and federal, against impairing

contract obligations, is a limitation upon the taxing power, as well as upon all legislation, whatever form it may assume.

10.    TAXATION—Property Subject—Exemptions—State Building Bonds Owned by Bank.    The contract between the state and the bank, in respect to the exemption of the bonds from taxation, extends to its shares of stock in the hands of individual share-holders, and entitles them to the right to deduct from the value of their shares that proportion of the value invested in the bonds.

11.    SAME.    The bonds being nontaxable for any purpose, and the state not having the power to tax the capital and surplus of a national bank, the shareholders, taxable on their shares, are entitled to proper reductions on account of the bank's ownership of said bonds, as any other view would ignore the covenant making the bonds nontaxable, and permit the state, in effect, to do that which it had contracted not to do.

(Syllabus by the Court.)

*Error from District Court, Grady County;*
*Will Linn, Judge.*

In the matter of the assessment of the First National Bank of Chickasha.   From a judgment of the district court, on appeal from an order of the County Board of Equalization of Grady County, such County Board and Board of County Commissioners of Grady County and the State bring error.   Affirmed.

*S. P. Freeling,* Atty. Gen., *Smith C. Matson,* Asst. Atty. Gen., *John H. Venable,* Co. Atty., and *Allen K. Swan,* Asst. Co. Atty., for plaintiffs in error.

*Bond, Melton & Melton,* for defendant in error.

*Stuart, Cruce & Cruce* and *Hatchett & Ferguson, amici curiae.*

SHARP, J.    February 18, 1910, the Legislature passed an act providing for the creation and management of what was designated the "Public Building Fund."   Chapter 16, Sess. Laws 1910, pp. 21-25.   Said act was by act of the Legislature amended March 15, 1911 (Sess. Laws 1910-11, pp. 194-199).   The latter act provided that all moneys

theretofore or thereafter received from the sale or rentals of section 33 of the public lands of the state, and lands granted in lieu thereof, the same being lands granted to the State of Oklahoma for charitable and penal institutions and public buildings, should constitute and be known as "The Public Building Fund"; that bonds of different denominations bearing interest at the rate of 5 per centum per annum, payable semiannually, should be issued against said fund, and that the State Auditor should, on or before the 1st day of April, 1911, issue public building bonds to the amount of $750,000, made payable to bearer, and place them in the hands of the State Treasurer for sale. The aggregate amount of bonds authorized was not to exceed the sum of $3,000,000, of which sum $2,451,500 was actually issued. The act provided that all outstanding warrants issued under the provisions of chapter 16 of the Session Laws of 1910 should become a valid lien against said building fund, and that the State Treasurer should receive sealed bids for the purchase of said bonds, or any part thereof at the time fixed, but that none of the bonds should be sold for less than par and accrued interest. The act further provided that the officers of the state, or of any municipality thereof, having charge of any sinking fund, could purchase said bonds from the State Treasurer at par. The proceeds of the sale of all bonds authorized was to be paid into the state treasury and used for the payment of the construction of charitable and penal institutions and public buildings. It was provided in section 7 that

"Any bank, trust or insurance company, organized under the laws of this state, may invest its capital and surplus in bonds, issued under the provisions of this act. The officers having charge of any sinking fund of the state or of any county, city, town, township or school district thereof, may invest the sinking fund of the state, or of

such county, town, township or school district in bonds issued under the provisions of this act, maturing prior to the date of the bonded indebtedness for the payment of which any such sinking fund is created. Said bonds shall also be approved collateral as security for the deposit of any public funds and for the investment of trust funds. Said bonds shall be nontaxable for any purpose."

By section 9 it was provided that:

. "All bonds and interest thereon, when issued as provided for in this act, shall become payable out of the public building fund, arising from the sale or rental of section 33, and lands granted to the state in lieu thereof, until all of said bonds and interest thereon are fully paid. And the good faith of the state is solemnly pledged to administer the trust created by the terms of the Enabling Act and the Constitution of Oklahoma, to apportion and dispose of all lands granted to the state for charitable and penal institutions and public buildings, as the Legislature may prescribe, and safely keep and preserve the proceeds of the rental and sale thereof, and apply same to the payment of the bonds authorized by this act, and the interest thereon, as the same falls due, and to use such funds, constituting the Public Building Fund, for no other purpose or purposes. * * *"

July 19, 1913, the First National Bank of Chickasha purchased of the State Treasurer, with the approval and consent of the Comptroller of the Currency, public building bonds of the par value of $200,000. Said bank afterwards sold to the First National Bank of Minco, out of its purchase from the State Treasurer, bonds of the par value of $20,000. In the month of May, 1915, said bank made a return to the county assessor of its property subject to taxation for the year 1915, from which it deducted the assessed valuation of its real estate in the State of Oklahoma, separately listed in the name of the bank, and the public building bonds owned by it. The return as made by

said bank was accepted by the county assessor, and was afterwards approved by the county board of equalization. July 20, 1915, the State Board of Equalization raised the valuation of national banks in Grady county having state building bonds deducted from their assessment in the sum of $200,000; and the assessment of Grady county was referred back to the county assessor and board of equalization of Grady county for the purpose of correction, equalization, and adjustment. On August 16, 1915, the county board of equalization, together with the county assessor, pursuant to the order and direction of the State Board of Equalization, met, and after hearing the protest of said bank and others affected, raised the assessed valuation of said bank in the sum equal to the par value of said public building bonds, namely, $180,000, and ordered the county assessor to extend such raise upon the tax rolls for the year 1915. From said order, under authority of section 2 of subdivision B, c. 107, Sess. Laws 1915, the bank prosecuted its appeal to the district court of Grady county, where the action of the county board was reversed, and said board was directed to deduct from the valuation of the bank the amount invested by it in public building bonds. From the order and judgment of the district court, the county board of equalization, and the board of county commissioners of Grady county, and the State of Oklahoma, have appealed to this court.

Primarily, the controversy involves the taxability of the public building bonds of the state, issued under the act of March 15, 1911. If said bonds are taxable, then the controversy is at an end. If not, the further inquiry is involved: That of the right of the shareholders in a national bank, whose capital and surplus is invested in nontaxable state bonds to a deduction upon the valuation

58—17

of their shares, on account of the nontaxable bonds owned by the bank. The question is one in which the state, the banks, both national and state, trust and insurance companies organized under the laws of the state, and public officers having charge of any sinking fund of the state, or of any county, city, town, township, or school district thereof, as well as the public generally, are vitally interested. For these reasons, and because of the fact that numerous suits are pending in the various courts of the state, involving the power of the state taxing authorities to assess for taxation the public building bonds of the state, it is important that our opinion should go to the merits of the controversy, laying aside all questions of the regularity of the proceedings, not of a jurisdictional character, had before the taxing authorities or in the trial court.

The statute, pursuant to which the bonds were issued, in terms provides that, "said bonds shall be nontaxable for any purpose." It is urged by the state, and its affected subdivisions, that the act is in conflict with section 50, art. 5, of the Constitution, providing that:

"The Legislature shall pass no law exempting any property within this state from taxation, except as otherwise provided in this Constitution."

And that as section 6 of article 10 of the Constitution, prescribing what is exempt from taxation, does not include state and municipal bonds, or either, and as such bonds in the hands of the owner constitute property, it follows that the bonds are taxable.

The sovereignty of a state, it was said by Mr. Chief Justice Marshall, extends to everything which exists by its own authority, or is introduced by its permission. *McCulloch v. Maryland*, 4 Wheat. 316, 429, 4 L. Ed. 579, 607.

While in section 36, art. 5, of our Constitution, it is broadly stated that:

"The authority of the Legislature shall extend to all rightful subjects of legislation."

The taxing power is one of the highest attributes of sovereignty, and its authority to tax all subjects over which its sovereign power extends, is undeniable. *In re Gross Production Tax of Wolverine Oil Co.*, 53 Okla. 24, 154 Pac. 362. The power to tax rests on necessity, and is inherent in sovereignty. It is vital to our form of government. With equal force it may be said that the power of exemption, as well as the power of taxation, is an essential attribute of sovereignty; that the power to tax includes the power to exempt, unless specially denied by the Constitution. The general right to make exemptions is involved in the right to apportion taxes, and exists in the supreme legislative power, unless expressly forbidden. Of this right it is said by an eminent authority:

"The general rule on the subject is familiar and has been too often declared to be open to question. The right to make exemptions is involved in the right to select the subjects of taxation and apportion the public burdens among them, and must consequently be understood to exist in the lawmaking power, wherever it has not in terms been taken away. * * * Exemptions, when properly made, must be determined in the legislative discretion, which is not, however, arbitrary; there must underlie its exercise some principle of public policy that can support a presumption that the public interest will be subserved by the exemptions allowed. (Cooley on Taxation, 342, 343.)

Section 7318, Rev. Laws 1910, as amended by the act of March 11, 1915, pp. 172, 173, in respect to the taxation of shares of stock in a national bank, conforms, it seems, to the requirements of section 5219 of the Revised Statutes

of the United States (U. S. Comp. St. 1913, sec. 9784), authorizing the assessment for taxation of the shares of national banking associations located within the state. *National Bank v. Kentucky*, 9 Wall. 353, 19 L. Ed. 701; *First Nat. Bank of Aberdeen v. County of Chehalis*, 166 U. S. 440, 17 Sup. Ct. 629, 41 L. Ed. 1069. While it is true that the old section of the statute appears at the beginning of the amended section, changed only in respect to date of taxation, said former statute is followed immediately, and in the same section, by the amendment, which sufficiently directs the taxation of the shares as distinguished from the the net value of their "moneyed capital, surplus and undivided profits," attempted to be taxed under the old statute. The right of the state to tax the shares of stock in a national bank rests upon the theory that shares in corporations are property entirely distinct and independent from the property of the corporation, and that the tax on an individual in respect to his shares in a national bank is not regarded as a tax upon the corporation itself. This distinction, now settled beyond dispute, was mentioned in *McCulloch v. Maryland*, 4 Wheat. 316, 4 L. Ed. 579, where in the opinion, declaring a tax upon a branch bank of the United States beyond the power of the State of Maryland, it was said:

That the opinion did not extend "to a tax imposed on the interest which the citizens of Maryland may hold in this institution, in common with other property of the same description throughout the state."

The distinction appears, however, to have first been made the basis of decision in *Van Allen v. Assessors, sub nom. Churchill v. Utica*, 3 Wall. 573, 18 L. Ed. 229, in which, under the act of 1864, as originally enacted, it was held that the tax on the shares was not a tax on the capital stock of the bank, but upon a distinct, independent interest

or property held by the shareholder.  The Van Allen Case, followed by a long line of decisions of the Supreme Court of the United States, has settled the law that a tax may be assessed by the state upon the owners of shares of stock in a national bank located therein: The tax assessed to shareholders may be required by law to be paid in the first instance by the corporations themselves as a debt and in behalf of the shareholders, leaving to the corporation the right to reimbursement for the tax paid for their shareholders, either under some express statutory authority for their recovery, or under the general principles of law that one who pays the debt of another, at his request, can recover the amount from him. *First Nat. Bank v. Kentucky*, 9 Wall. 353, 19 L. Ed. 701; *First Nat. Bank v. Chehalis County*, 166 U. S. 440, 17 Sup. Ct. 629, 41 L. Ed. 1069; *Merchants' & M. Nat. Bank v. Pennsylvania*, 167 U. S. 461, 17 Sup. Ct. 829, 42 L. Ed. 236; *Cleveland Trust Co. v. Lander*, 184 U. S. 111, 22 Sup. Ct. 394, 46 L. Ed. 456. Hence we say that whatever may have been the law in this state respecting the taxation of national banks prior to 1915, and regardless of its validity, the act of March 11th of that year, in so far as the right to tax is concerned, is sufficient to authorize an assessment of the shares of stock of a national bank located within the state.  The act of Congress (section 5219, Rev. Stat.) was not intended to curtail the power of the state on the subject of taxation. It simply required that the capital invested in national banks should not be taxed at a greater rate than like property similarly invested, and that the shares of any national banking association, owned by nonresidents of the state, should be taxed in the city or town where the bank is located, and not elsewhere.  It was not intended to cut off the power to exempt particular kinds of property, if the Legislature chose to do so.  The discretionary power of the

Legislature remained as it was before the act. *New York v. Commissioners*, 2 Black (67 U. S.) 620, 17 L. Ed. 451; *Adams v. Nashville*, 95 U. S. 19, 24 L. Ed. 369. The assessment list meets the greater part, if not all, the requirements of the amended statute, particularly in respect to furnishing the list of names and residences of all stockholders of the bank, with the number and assessed value of the shares held by each of the stockholders. It is not claimed that the bank should not pay on account of its stockholders taxes on their shares of stock, but that proper deductions on account of interest in nontaxable bonds should be allowed. For the purposes of the case we shall therefore consider the shares of stock of the bank to have been properly assessed.

The proceeds of the sale of the bonds, authorized by the act, were to be used by the state for the payment of the construction of needed charitable and penal institutions, and public buildings. Such was the governmental object sought to be effected by the issuance and sale of said bonds. To its accomplishment the good faith of the state was solemnly pledged to safely keep and preserve the proceeds of the sale and rental of the public lands of the state, named in the act, and to apply said proceeds to the payment of the bonds issued, with interest thereon, as the same matured. It was necessary, or at least so considered, that the credit of the state be employed in order that it might promptly and faithfully discharge the obligations assumed by and resting upon it. The issuance of bonds secured in the manner provided for was a method usual and ordinary in the use of the state's credit. When a state issues its bonds in conformity to law in order to raise money to accomplish and carry out a governmental purpose, the instruments issued by it for that purpose are in-

strumentalities of government.  Such obligations constitute
the means resorted to by the state to effectuate the powers
of government.    In  the  hands  of  the  purchasers  such
credits may be the subject of taxation, unless because of
some  superior  intervening  right,  provided  the  intention
to tax is manifest.  Cases involving the liability of state
or municipal bonds to taxation very generally hold that
laws providing for the imposition of taxes will not be con-
strued to authorize the collection of a tax upon such bonds,
unless there is in the law clear language that such was the
legislative intent.  The statute authorizing the issuance of
the bonds, it must be remembered, in terms provided that
they should be nontaxable.  The pledged immunity on the
part of the state attached in the act, so that at no period
of time were the bonds subject to taxation.  Not only was
such the case, but the very act under which the present
assessment was made exempts the bonds of the state from
taxation.  Originally, it was provided by section 7302, Rev.
Laws 1910, that:

"All property in this state, whether real or personal,
including the property of corporations, banks and bankers,
except such as is exempt shall be subject to taxation."

This section of the statute was amended by the act of
March 11, 1915, by inserting therein the words:

"Except bonds of this state, and its counties, cities,
towns, school districts and other municipalities of this
state."

It is a rule firmly established in our jurisprudence that
the bonds of the United States government cannot be taxed
by the states, and that bonds of the states cannot be taxed
by the United States government, for the reason that such
bonds are but instrumentalities of government; that the
power of the federal government to tax the bonds of the

state, as well as the power of the state government to tax the bonds of the general government, would be a power to embarrass each sovereignty in the exercise of its governmental functions. *McCulloch v. Maryland*, 4 Wheat. 316, 4 L. Ed. 579; *Weston v. Charleston*, 2 Pet. 449, 7 L. Ed. 481; *New York ex rel. Bank of Commerce v. Commissioners*, 2 Black, 620, 17 L. Ed. 451; *Buffington v. Day*, 11 Wall. 113, 20 L. Ed. 122. A sovereign state may, at its election, when not restrained by its Constitution, permit its own property to be taxed, as well as its agencies of government, including evidences of indebtedness issued on the basis of the credit of the state, in the exercise of its power to borrow money. *State, Chancellor, v. Elizabeth*, 65 N. J. Law, 479, 47 Atl. 454; *People v. Home Ins. Co.*, 29 Cal. 533; *Norfolk v. Perry County*, 108 Va. 28, 61 S. E. 867, 35 L. R. A. (N. S.) 167, 128 Am. St. Rep. 940; *Murray v. Charleston*, 96 U. S. 432, 24 L. Ed. 760.

While it is true the obligations of the state, in the form of its bonds, are not specifically named in the Constitution as exempt from taxation, we do not believe that the framers of the Constitution, fully cognizant of the many necessities of the state upon its admission into the Union, intended, by denying to the Legislature the power to discriminate between taxpayers, to thereby curtail its power to provide in the most efficient way possible, and in such method as its judgment and patriotism might suggest, for the preservation of the credit and good faith of the people of the state. Fairly construed, the Constitution, denying the Legislature the right to exempt property from taxation, reflects the wisdom of the times. By this limitation an effectual curb was placed upon abuses that had crept into the legislation of many of the sister states. Favoritism, involving exemption from taxation, was thereby made impos-

sible, or at least unenforceable, save in the limited and exceptional instances provided for in section 6, art. 10, of the Constitution. By the provision against exemption from taxation, it was not intended to deny to the state an exercise of sovereignty so necessary and essential to the due and orderly administration of its affairs. It was not intended thereby to deny to the state the power to go upon the open money markets of the world and compete for money upon equal terms with other sovereign states; or to deny to the state the power to provide a security of equal attractiveness to its own citizens with that of other state governments of no better credit. Neither was it the purpose to place the state in the ungenerous attitude of asking the public to advance money upon its securities, which it was thereafter bound to render unprofitable by enforced taxation. Thus interpreted, the state building bonds, constituting as they do obligations of the state for the payment of money, and being an exercise of the borrowing power, and a use of the state's credit, do not constitute property within the meaning of section 50, art. 5, of the Constitution; and hence the statutes exempting such bonds from taxation do not contravene the constitutional limitation against exemption from taxation. Our conclusions we believe to be supported both by sound principle and the weight of authority. Discussing the subject of taxation of agencies and instrumentalities of state governments, 37 Cyc. 883, announces the following rule:

"Nor, as in the case of public property generally, will the state itself impose taxes upon its own public or governmental agencies or instrumentalities, or those of its own municipal corporations, or a municipality tax such agencies or instrumentalities of a state. The bonds and other securities of a state, or of its municipalities, are generally exempt from all taxation by the state itself and its municipal

corporations, either by express provisions of law or by implication."

In the well-considered opinion of *Louisiana ex rel. Da Ponte v. Assessors,* 35 L. Ann. 651, the Supreme Court of Louisiana held that a law directing the taxation of all property would not, for that reason, include public property, or any of the means, appliances, or instruments of government; that municipal bonds or contracts for the payment of money were an exercise of the borrowing power and the use of the public credit; and that the taxation of such bonds in the hands of a private person was a taxation of the public credit, and a burden on the borrowing power. Again, in the later case of *State ex rel. Louisiana Improvement Co. v. Assessors,* 111 La. 982, 36 South. 91, it was held that a general law, in terms directing that all property be taxed, including "bonds," "credits," did not include public property as property to be taxed, nor "public securities," due by the municipality by which they were issued; nor did it include within its terms public credits of the municipality by which the tax was demanded.

In *Miller v. Wilson et al.,* 60 Ga. 505, it was said that in the absence of explicit language clearly expressing the will of the Legislature to tax the bonds of the state, the General Assembly will not be presumed to have passed on so grave a question of public policy, from the use of general words, especially when like words had been employed in former acts, and the executive department had never construed them to embrace state bonds. In *Penick, Tax Collector, v. Foster, Ex'r,* 129 Ga. 217, 58 S. E. 773, 12 L. R. A. (N. S.) 1159, 12 Ann. Cas. 346, after declaring that nothing was better settled than that securities issued by the government are as much the instrumentalities of the government as other means adopted by it to perform its

functions, and that it was immaterial whether the security be issued by the state, or by a county, or by a municipality, as it was in all cases an instrumentality, issued for the purpose of effectuating those objects for which government exists, the rule was announced that bonds issued by a municipal corporation, as evidence of a loan made to it, were instrumentalities of the government which created the municipal corporation, and that laws providing for the collection of taxes will not be so construed as to authorize the collection of a tax upon such instrumentalities of the government, unless there is in the law clear language declaring that such was the intention of the lawmaking power.  Also that the word "property," in that clause of the Constitution of the State of Georgia (art. 7, sec. 2, par. 1) which declares, "all taxation shall be uniform upon the same class of subjects, and *ad valorem* on all property subject to be taxed within the territorial limits of the authority levying the tax," correctly construed, did not require the taxing of public property, or any of the lawful instrumentalities of government.  That there was not, in the tax law of that state, any terms which expressly declared that the bonds of the state, or its various political subdivisions, were subject to tax, nor any language in such laws which clearly indicated that it was the intention of the General Assembly to subject these instrumentalities of government to taxation, either by the state or any county thereof.

To the foregoing authorities we may add that of *Mercantile Nat. Bank v. City of New York*, 121 U. S. 138, 7 Sup. Ct. 826, 30 L. Ed. 895, in which it was said:

"The amount of the exemption in this case is comparatively small, looking at the whole amount of personal property and credits which are the subjects of taxation, not large enough, we think, to make a material difference in

the rate assessed upon national bank shares; but, independently of that consideration, we think the exemption is immaterial. Bonds issued by the State of New York, or under its authority by its public municipal bodies, are means for carrying on the work of the government and are not taxable even by the United States, and it is not a part of the policy of the government which issues them to subject them to taxation for its own purposes. Such securities undoubtedly represent moneyed capital, but as from their nature they are not ordinarily the subjects of taxation, they are not within the reason of the rule established by Congress for the taxation of national bank shares."

Keeping in mind the close relation that ever exists between the right to tax and the power to exempt from taxation, the principle upon which the foregoing cases rest is the same as in the case under consideration. There being nothing in the Constitution that expressly forbids the Legislature to exempt the bonded indebtedness of the state from taxation, the consequence is that the power to do so exists, and may be called into action at the legislative will.

The power of the Legislature to exempt the bonds from taxation being, we think, clearly established, was it the purpose and intent so to do? The language of the statute is broad and comprehensive. The intention was indubitable. As plainly expressed, the bonds were made nontaxable for any purpose. Not only did the statute authorizing the issuance of the bonds provide for their nontaxability, but printed in the face of the bonds was a provision, "This bond is nontaxable under the laws of the State of Oklahoma." And to which was added the usual certificate of the Attorney General and *ex officio* bond commissioner of the state. From the foregoing, as well as from the subsequent acts of the Legislature, there is no room to doubt that the Legislature intended to exempt the bonds from all form of taxation, on any account, or for any purpose.

While the bonds of a state, held by the residents of the state by which they are issued, may be taxed by the state or by its lawful authority, such may not be done if there be a valid contract with the holder exempting them from taxation.   Dillon on Municipal Corporations, pars. 1399, 1401; Gray, Limitations of Taxing Power, pars. 1049, 1051.  As stated by Cooley on Taxation, pp. 355, 356:

"A state sometimes makes the bonds or other evidences of indebtedness issued by itself nontaxable.  When this is done before the indebtedness is incurred, a contract is established between the state and those who become its creditors, which precludes withdrawing the exemptions."

It is a rule well supported by authority that a Legislature has the power, when not restricted by some constitutional provision, to contract with a corporation for its immunity from taxation.  *State v. Baltimore & O. Ry. Co.,* 48 Md. 49; *Mobile & S. H. Ry. Co. v. Kennerly,* 74 Ala. 566; *St. Louis, I. M. & S. Ry. Co. v. Berry,* 41 Ark. 509; *Commonwealth v. Richmond & P. Ry. Co.,* 81 Va. 355.

The petition of the bank alleges, and the uncontradicted evidence shows, that the bank, through its officers and directors, and representing its stockholders, purchased the bonds upon the advice and under the belief that they were nontaxable; and that such was the construction placed upon the law by the then Attorney General, Governor, State Treasurer, and the state taxing authorities. The transaction between the state and the purchasers of its bonds amounted to a contract that the bonds should be nontaxable.  *Humphrey et al. v. Pegues,* 16 Wall. 244, 21 L. Ed. 326; *Pacific Ry. Co. v. Maguire,* 87 U. S. (20 Wall.) 36, 22 L. Ed. 282; *Murray v. Charleston,* 96 U. S. 432, 24 L. Ed. 760; Gray, Limitations of Taxing Power, pars. 998, 998a.

It has been said that a compact lies at the foundation of all national life; that contracts mark the progress of communities in civilization and prosperity. They guard, as far as possible, against the fluctuations of human affairs. They seek to give stability to the present and certainly to the future. They gauge the confidence of man in the truthfulness and integrity of his fellow men. They are springs of business, trade and commerce. Without them society could not go on. Spotless faith in their fulfillment honors alike communities and individuals. Where this is wanting in the body politic, the process of decent has begun, and the lower plane will be speedily reached. To the extent to which the defect exists among individuals, there is decay and degeneracy. As are the integral parts, so is the aggregated mass. Under the monarchy or aristocracy order may be upheld and rights enforced by the strong arm of power. But a republican government can have no foundation other than the virtue of its citizens. When that is largely impaired, all is imperiled. *Burke, Ex'r, v. Child,* 21 Wall. 441, 22 L. Ed. 623; *Farrington v. Tennessee et al.,* 95 U. S. 679, 24 L. Ed. 558; 1 Montesquieu's Spirit of Laws, 17-25.

By the statute any bank, trust, or insurance company, organized under the laws of this state, was authorized and invited to invest its capital and surplus in said bonds. By the sale of the bonds the state was enabled to discharge a great public duty in the erection and furnishing of charitable and penal institutions and public buildings of the state. Inducements in the way of making the bonds approved collateral as security for the deposit of any public funds, and for the investment of trust funds, were offered investors; and the good faith of the state was solemnly pledged to administer the trust created by the terms of the Enabling

Act and the Constitution of Oklahoma, to apportion and dispose of all lands granted to the state for charitable and penal institutions and public buildings, as the Legislature might prescribe, and safely keep and preserve the proceeds of the rental and sale thereof, and apply the same to the payment of the bonds authorized by the statute, and the interest thereon, as the same fell due at maturity, and to use such funds constituting the public building funds for no other purpose or purposes.

As the capital and surplus of a national bank cannot be taxed by a state, but the shareholders, both resident and nonresident, may, no benefit could accrue either to the bank or its shareholders if deductions on account of the ownership of said bonds are not allowed the latter. This, it is claimed by the Attorney General, cannot be done, on the authority of *Van Allen v. Assessors, sub nom. Churchill v. Utica*, 3 Wall. 573, 18 L. Ed. 229; *New York v. Commissioners of Taxes*, 4 Wall. 244, 18 L. Ed. 345; *Tennessee v. Whitworth, Trustee*, 117 U. S. 129, 6 Sup. Ct. 645, 29 L. Ed. 830; *Home Sav. Bank v. Des Moines*, 205 U. S. 503, 27 Sup. Ct. 571, 51 L. Ed. 901.

But the question decided in the foregoing cases is not decisive of that at hand. We are concerned, not alone in the power of the state to tax the shareholder, or his right to exemptions on account of ownership by the bank of nontaxable government bonds, but in a proper application of the local statute, making certain of the bonds of the state nontaxable for any purpose, and the rights of the shareholders in a national bank, arising out of a contract between the state and the officers and directors of the bank in the purchase of its bonds. It is not, as already seen, a question of power in the Legislature, but of the rights of the shareholders springing out of the purchase of the

bonds under the circumstances appearing from the record, and of which we may take notice. It is said in Gray on Limitation of the Taxing Power, par. 997, that the cases where a state has made a direct contract for exemption or commutation of taxes, not contained in the corporate charter, are few compared to the number of those where corporate charters have contained the contract. Among the former class is *Pacific Ry. Co. v. Maguire*, 20 Wall. 36, 22 L. Ed. 282, where it seems that the State of Missouri, which had previously chartered the Pacific Railroad Company, granted to it by legislative act certain lands owned by the state, and provided for the issuance of bonds for which the state had a lien on the road. The lands and the proceeds of the bonds were to be used in the construction of a new branch road, and the railroad was to pay the principal and interest of the bonds, and to secure subscriptions to them. The act also provided for an acceptance by the company of the grant, and contained an exemption from taxation until the road should be completed, in operation, and should declare a dividend. The company accepted the act. Both the state and the road defaulted in the interest on the bonds, and after a device in the nature of a legislative receivership had been tried the state levied a "tax," the proceeds of which, it enacted, should be devoted to the payment of the bonds and the interest, which were the common obligations of the state and the company. The stipulated event had not occurred, upon which the property of the company should become taxable. It was held that the circumstances constituted a contract between the state and the company, and the tax was void.

In *New Jersey v. Yard*, 95 U. S. 104, 24 L. Ed. 352, the language of the act, which it was held constituted a contract between the railroad company and the state, in respect to its taxation, provided:

"Which tax (one-half of 1 per cent.) shall be in lieu and satisfaction of all other taxation or imposition whatsoever by or under the authority of this state, or any law thereof."

And it was said in denying the right of the state to levy a further tax:

"Is there here to be implied 'except such laws as may hereinafter be enacted?' Such a provision would be to nullify the whole contract. How could the tax be in lieu and satisfaction of all other taxation, if other taxes might be imposed next day? Or how can it be said to be in satisfaction of all taxes whatsoever under authority of the state, if the state could immediately impose another and more burdensome tax?"

Full force was given by the court to the doctrine that when it is asserted that a state has bargained away her right of taxation in a given case, the contract must be clear and cannot be made out by dubious implications. And it was said that of the existence of a contract, there was no doubt. That its meaning and terms were clear enough, and, taken alone, constituted a contract which would be protected by the Constitution of the United States.

In *Murray v. Charleston*, 96 U. S. 432, 24 L. Ed. 760, it was held that a municipality of a state could not by its ordinances, under the guise of taxation, relieve itself from performing to the letter all that it expressly promised to its creditors. It was argued on behalf of the defendant that the State of South Carolina and the city council of Charleston possessed the power of taxation when the contracts were made; that by the contracts the city did not surrender this power; that, therefore, the contracts were subject to its possible exercise, and that the city ordinances were only an exertion of it. It was said that the power of a state to impose taxes upon subjects within its jurisdiction

was unlimited (with some few exceptions), and that it extended to everything that exists by its authority, or is introduced by its permission. Hence it was to be inferred that the contracts with the city of Charleston were made with reference to this power, and in subordination to it. All this, it was said by the court, may be admitted, but that it did not meet the case of the defendant. That the court did not question the existence of a state power to levy taxes, as claimed, nor the subordination of contract to it, so far as unrestrained by constitutional limitation. But the power was not without limits, and one of its limitations was found in the clause of the federal Constitution, that no state shall pass a law impairing the obligation of contracts. The opinion in part reads:

"A change of the expressed stipulations of a contract, or a relief of a debtor from strict and literal compliance with its requirements, can no more be effected by an exertion of the taxing power than it can be by the exertion of any other power of a state Legislature. The constitutional provision against impairing contract obligations is a'limitation upon the taxing power, as well as upon all legislation, whatever form it may assume. Indeed, attempted state taxation is the mode most frequently adopted to affect contracts contrary to the constitutional inhibition."

Proceeding further, the court said:

"What, then, is meant by the doctrine that contracts are made with reference to the taxing power resident in the state, and in subordination to it? Is it meant that when a person lends money to a state, or to a municipal division of the state having the power of taxation, there is in the contract a tacit reservation of a right in the debtor to raise contributions out of the money promised to be paid before payment? That cannot be, because if it could, the contract (in the language of Alexander Hamilton) would 'involve two contradictory things: An obligation to do, and a right not to do; an obligation to pay a certain sum,

and a right to retain it in the shape of a tax. It is against the rules, both of law and of reason, to admit by implication in the construction of a contract a principle which goes in destruction of it.' "

A review of a number of cases where the contract for exemption of taxes is found in the corporate charters may properly be considered in this connection. The case at hand is not unlike, in some of its material aspects, that involved in *Gordon v. Appeal Tax Court,* 3 How. 133, 11 L. Ed. 529. The inquiry raised in that case, by the agreed statement of facts, was: Did the Act of Maryland of 1841, c. 23, so far as it imposed a tax upon shares of stock held by stockholders in the Union Bank of Maryland, and other banks mentioned in the statement, impair the obligation of a contract? The banks were classified in the statement as old and new banks. The old were those which were chartered previous to the year 1821; the new, those which were chartered after the year 1830. Their exemption from the tax imposed by the act of 1841 was claimed under the Acts of Maryland of 1821, c. 131, and that of March, 1835, c. 274, called the act of the session of 1834. In the opinion it is said:

"Has such an exemption been given to the old banks? The language of the eleventh section of the act of 1821 is: 'And be it enacted, that, upon any of the aforesaid banks accepting and complying with the terms and conditions of this act, the faith of the state is hereby pledged not to impose any further tax or burden upon them during the continuance of their charters under this act.' This is the language of grave deliberation, pledging the faith of the state for some purpose—some effectual purpose. Was that purpose the protection of the banks from what the Legislature and succeeding Legislatures could not do, if the banks accepted the act, or from what they might do, in the exercise of the taxing power? The terms and conditions of the act were, that the banks should construct the road and pay annually a designated charge upon their capital stocks,

as the price for the prolongation of their franchise of bank-ing. The power of the state to lay any further tax upon the franchise was exhausted. That is the contract between the state and the banks. * * * Having determined that the clause in question was not meant as a pledge against further taxation upon the franchise of the banks, but that it was a pledge against additional taxation, what is the extent of exemption given by it, or to what does it apply? Does it exempt the respective capital stocks of the banks, as an aggregate, and the stockholders from being taxed as persons on account of their stock? We think it does both. The aggregate could not be taxed, without its having the same effect upon the parts that a tax upon the parts would have upon the whole. Besides, the Legislature, in proposing the terms and conditions of the act, use the word 'banks' with reference to the consent or acceptance of the act being given by the stockholders, according to a fun-damental article of their charters. * * * True it is, when accepted and recognized, it became a contract with the banks. But its becoming a contract with the banks determines of itself nothing. We must look in what character, or by whose assent it was to become a con-tract with the state, to ascertain the intention of the Legis-lature in making the pledge, 'that upon any of the aforesaid banks accepting and complying with the terms and condi-tions of this act, the faith of the state is hereby pledged not to impose any further tax or burden upon them during the continuance of their charters under this act.' "

It was further said that the Legislatures of 1813 and 1821 were anxious to have a certain highway constructed, which they thought the convenience and intercourse of the citizens of Maryland required; and they were also anxious to raise an adequate school fund for every county in the state. They determined that both should be accomplished by incorporating certain banks, with the obligation upon them to make the roads, and to make all the banks in the state pay an annual tax upon their capital as a condition

upon which their charters were to be extended. Referring to the Acts of 1813 and 1821, the court observed:

"In whatever way we examine the Acts of 1813 and 1821, we are of opinion that it appears from the eleventh sections in those acts, to have been the intention of the Legislatures which passed them, to exempt the stockholders from taxation as persons on account of the stock which they owned in the banks. This exemption, however, is limited to the old banks in Baltimore which were chartered before 1821, during the continuance of their charter under the Act of 1821. It is founded upon the eleventh section of that act, and it is our opinion that the Act of 1841, c. 23, in so far as it imposes a tax upon the stockholders in those banks, on account of their stock, does impair the obligations of a contract and is void by the tenth section of the first article of the Constitution of the United States."

In *Piqua Branch of State Bank of Ohio v. Knopp*, 16 How. 369, 14 L. Ed. 977, quoting from the opinion of the court in *State of Ohio v. Commercial Bank of Cincinnati*, 10 Ohio, 535, Mr. Justice McLain said:

"* * * The Supreme Court of Ohio say, we take it to be well settled that the charter of a private corporation is in the nature of a contract between the state and the corporation. Had there ever been any doubts upon this subject, those doubts must have been removed by the decision of the Supreme Court of the United States, in the case of *Woodward v. Dartmouth College*. And the court remark, 'The General Assembly say to such persons as may take the stock, you may enjoy the privilege of banking, if you will consent to pay the State of Ohio, for this privilege, 4 per cent. on your dividends, as they shall from time to time be made. The charter is accepted, the stock is subscribed, and the corporation pays, or is willing to pay, the consideration stipulated, to wit, the 4 per cent.' And the court say, 'Here is a contract, specific in its terms, and easy to be understood.' 'A contract between the state and individuals is as obligatory as any other contract. Until a

state is lost to all sense of justice and propriety, she will scrupulously abide by her contracts, more scrupulously than she will exact their fulfillment by the opposite contracting, party.' This opinion commends itself to the judgment, both on account of its sound constitutional views and its elevated morality. * * * That decision was calculated to give confidence to those who were desirous to make investments in banking operations, or otherwise, in the State of Ohio."

Again, in the course of the opinion, it is said:

"A state, in granting privileges to a bank, with a view of affording a sound currency, or of advancing any policy connected with the public interest, exercises its sovereignty, and for a public purpose, of which it is the exclusive judge. Under such circumstances, a contract made for a specific tax, as in the case before us, is binding. This tax continues, although all other banks should be exempted from taxation. Having the power to make the contract, and rights becoming vested under it, it can no more be disregarded nor set aside by a subsequent Legislature than a grant for land. This act, so far from parting with any portion of the sovereignty, is an exercise of it. Can any one deny this power to the Legislature? Has it not a right to select the objects of taxation and determine the amount? To deny either of these is to take away state sovereignty."

In *Jefferson Branch Bank v. Skelly*, 1 Black, 436, 17 L. Ed. 173, the rule was announced that State Legislatures, unless prohibited by State Constitutions, may contract by legislation to release from taxation a particular thing, corporation, or person.

In *Farrington v. Tennessee*, 95 U. S. 679, 24 L. Ed. 558, it was said that the charter of a bank which declares, "that the bank shall pay to the state an annual tax of one-half of 1 per cent. on each share of capital stock subscribed which shall be in lieu of all other taxes," is a contract between the state and the bank, and any other tax than that

therein specified is expressly forbidden.    Many authorities are cited or reviewed in the opinion of the court, and the doctrine announced in *Gordon v. Appeal Court* is reaffirmed. After referring to the power of the Legislature granting the charter, the opinion reads:

"There is no question before us as to the tax imposed on the shares by the charter.    But the state has by her revenue law imposed another and an additional tax on the same shares.    This is one of those 'other taxes' which it had stipulated to forego.    The identity of the thing doubly taxed is not affected by the fact that in one case the tax is to be paid vicariously by the bank, and in the other by the owner of the share himself.    The thing thus taxed is still the same, and the second tax is expressly forbidden by the contract of the parties.    After the most careful consideration, we can come to no other conclusion.    Such, we think, must have been the understanding and intent of the parties when the charter was granted and the bank organized.    Any other view would ignore the covenant that the tax specified should be 'in lieu of all other taxes.'    It would blot those terms from the context, and construe it as though they were not a part of it."

In *Tennessee v. Whitworth, Trustee,* 117 U. S. 129, 6 Sup. Ct. 645, 29 L. Ed. 830, the charter exemption from taxation of the capital stock of the Nashville, Chattanooga & St. L. Ry. Co. was held to apply to its shares of stock in the hands of individual stockholders.    In the course of the opinion it was announced that in construing statutes which are binding on states as contracts, the words employed are, if possible, to be given the same meaning they had in the minds of the parties to the contract when the statute was enacted.    In that respect, it was said, there is no difference between a contract of a state and a contract of a natural person.    That if the words employed are capable of more than one meaning, that meaning is to be given them which, taking the whole statute together, it is

apparent the parties intended they should have. In conclusion, it was said:

"The charter exempted the stock from taxation clearly because the property which represented the stock had been put in its place as a taxable thing. The exemption is of the thing called 'capital stock' divided into shares. As the whole is exempt, so must necessarily be its several parts or shares."

In *Powers v. Detroit, G. H. & M. R. Co.,* 201 U. S. 543, 26 Sup. Ct. 556, 50 L. Ed. 860, it was held that a contract between a state and a railway company which prevented the subjection of the property of the company to any other than the tax prescribed in Michigan Laws 1855, p. 305, sec. 9, was created by the provisions of that section that the company should pay an annual tax of 1 per cent. of the capital stock of said company, paid in, which tax should be in lieu of all other taxes except for penalties imposed on said company, and should be estimated upon its last annual report, the statute being a special one having reference only to the company in question, which formally accepted the taxation provision, and made large expenditures and completed an unfinished railroad, to induce which was the motive of the enactment.

In *Penrose, Treasurer, v. Chaffraix,* 106 La. 250, 30 South. 718, it appears that when the Legislature of Louisiana in 1833 (Laws 1833, p. 172) exempted the capital of the Citizens' Bank of Louisiana from taxation, it meant, according to the opinion, to include in the exemption that which represented the capital—the shares in the hands of those who had subscribed to the capital stock. And it was said that where there is an exempting clause in the charter, the question is one of the legislative intent as to the scope and extent of the exemption, rather

than one of the legislative power.  The act incorporating the bank, in consideration of certain benefits therein stipulated the state, declared the corporation exempt from taxation.  The thirtieth section thereof provided:

"The said corporation shall, during its existence, be exempt in its capital and property, * * * from all taxes to the state, or to any parish or corporation created by the law of this state."

A subsequent act passed in 1836 (Laws 1836, p. 16) greatly enlarged the scope of the bank's purpose and the extent of its power.  It pledged the faith of the state as security for a sum as large as $12,000,000, and bonds of the state, predicated upon this pledged faith, to the extent of $7,000,000 were issued, and by means thereof the capital needed for the enlarged purpose of the bank was secured.  There was an exemption of the bank from taxation, superseding the previous exemption in these words:

"And the capital of said bank shall be exempt from any tax laid by the state, or by any parish or body politic under the authority of the state during the continuance of its charter."

Construing the exemption feature of the statute, it was observed:

"When the Legislature exempted the capital of the bank from taxation it meant to include in the exemption that which represented the capital, which was the tangible evidence of the capital—the shares in the hands of those who had subscribed to the fund which went to make up the capital.  That was the usual meaning, the ordinary significance, of the terms employed.  It was so taken and understood at the time and long subsequent thereto, as is shown by the fact that down to the present time neither the capital of the bank nor the shares of its capital stock have ever been amenable to taxation."

It was further said, discussing the subsequent effort to tax the shares:

"What, invite private subscriptions to a fund designed to form in part the capital of a bank which is to become an instrument of the state, formally exempt this capital from taxation and yet latently reserve the right, secretly entertain the intention, of some day taxing the certificates which show that A., B., C., D., and others had supplied the money which constituted the capital! To so hold would be to impugn the justice, fairness and good faith of the Legislature which enacted, and the executive who approved the act. It is a question of intention and we cannot hold that the lawmakers of that early period meant to ensnare the then subscribers to the capital stock by exempting the capital itself, yet reserving the right to succeeding generations to tax the shares representing that capital in the hands of the heirs and assigns of those who subscribed."

It was said that the subscribers dealt with the bank upon the public faith of the state, as declared in its statutes; that the exemption was granted for a consideration, and formed a contract between the state and the corporation. Citing *Gordon v. Appeal Tax Court, supra,* it was said that the contract with the bank was a contract with the stockholders of the bank. Further, in this respect, the opinion reads:

"It can hardly be doubted that if the original subscribers to the capital stock had been informed the offer of the state to exempt the capital was not intended to exempt the shares in their hands, the consequence would have been they would not, in many instances, have subscribed to the stock. There would have been no sufficient inducement for them to do so, on that score. Whether the tax came out of their pockets directly, or whether it came out of the bank, to be deducted from their dividends, or to affect the value of their shares, there was not to them the shadow of a difference."

In conclusion, it was noted that when the state contracts, it places itself on an equality with other contracting parties, and thus becomes liable to the application of the rule of *contra proferentem*.

In *Richardson v. City of St. Albans,* 72 Vt. 1, 47 Atl. 100, it was held that under the Vermont Statutes, sec. 365, providing that certain manufacturing establishments, and all capital and personal property used in their business, might be exempt from taxation for a term of years, if the town so voted; and section 411 of the statutes, declaring that in determining the list of a taxpayer, the amount of his stocks and bonds which were exempt from taxation should be deducted from the appraised value of his personal estate—where the stock of a manufacturing corporation had been exempted from taxation by vote of the city in which it was located, its shares of stock in the hands of the shareholders were exempt.

In *State v. Baltimore & O. R. Co.,* 48 Md. 49, 73, 74, the Baltimore & Ohio Railroad Company, incorporated in 1826 (being the first railroad ever chartered in this country for the transportation of freight and passengers), proposed to construct a railroad from Baltimore to the Ohio river, a distance of 379 miles, involving in its construction an expenditure of an enormous sum of money, and it was therefore justly considered not only as a gigantic, but in a pecuniary sense a hazardous, enterprise. Under these circumstances the Legislature was willing to confer on it every privilege and immunity which could be reasonably required, and which would tend to the completion of the road. In the charter it was provided:

"And the shares of the capital stock of the said company * * * shall be exempt from the imposition of any tax or burthen."

It was said by the court, in construing the exemption provision:

"As used in this connection, we understand the Legislature to mean that the shares of stock, representing the property and profits of the company, shall be exempt from the imposition of any tax or burthen. The Legislature, beyond all question, intended to confer a substantial benefit on the company, and thereby to induce capitalists and others to invest their means in the construction of a road, which every one deemed of so much importance to the state. And to say they meant to exempt the shares only, and to reserve the right to tax the property and franchises, is a construction that would render the privilege thus granted of no practical benefit to the appellee."

And it was held that the exemption from taxation, granted in the charter of the company, was a contract between the state and the corporators, within the protection of the Constitution of the United States, and therefore beyond the power of a subsequent Legislature to repeal or in any manner impair.

In *Commonwealth v. Richmond & P. R. Co.*, 81 Va. 355, the charter of the Richmond and Petersburg Railroad Company provided that:

"All machines, wagons, vehicles and carriages purchased with the funds of the company, and all other works constructed under the authority of this act," of the Legislature, "and all profits which shall accrue from the same, shall be vested in the respective shareholders of the company forever, in proportion to their respective shares; and the same shall be deemed personal estate, and shall be exempt from any public charge or tax whatsoever."

And it was held that all the property and profits of the company, and also all the shares of the respective shareholders, were exempt from taxation, whether state, county, or municipal.

Where the tax is in fact laid upon the franchise of a corporation, although measured by the amount of its capital stock, the manner in which the capital is invested is not material. But if the tax is really upon the property or assets of the corporation, as represented by its capital, allowance must be made for such portion of the capital as is invested in nontaxable property. *New York v. New York Tax Com'rs,* 2 Wall. 220, 17 L. Ed. 793; *German-American Sav. Bank v. Burlington,* 54 Iowa, 609, 7 N. W. 105; *State ex rel. Davis v. Rogers,* 79 Mo. 283; *Whitney v. Madison,* 23 Ind. 331; *Newark City Bank v. Assessor,* 30 N. J. Law, 13, 28; *City of New Orleans v. New Orleans Canal & Banking Co.,* 29 La. Ann. 851; 27 Cyc. 820.

In the present case, of the invested capital of the bank, including surplus fund and undivided profits, $180,-000 was invested in non-taxable state bonds. This money, the proceeds arising from the sale of said bonds, had been paid into the state treasury to the credit of the state building fund. Had the purchase been made by a private individual, it is obvious that the tax would not lie. In such case the state would in effect be levying a tax upon the bonds. The purchaser having parted with his money, he could not be taxed thereon; not until the redemption of the bonds by the state and the money paid on account thereof was again in his hands. There being a contract between the state and the officers of the bank, acting both on account of the bank and in behalf of the shareholders, and the statute making the bonds nontaxable for any purpose, effect cannot be given the promised immunity, and upon which the bank acted, unless by allowing shareholders the right to deduct from the value of their shares that proportion of the value invested in nontaxable state

bonds. Not to do so would be to fail to give to the statute making the bonds nontaxable all practical value and effect, and make the exemption from taxation of the bonds held by national banks as investments of capital wholly unreal and illusory. Pledging the faith of the state, we have seen, is an act evidencing "grave deliberation," intended to accomplish some "effectual purpose." An end not intended, but on the other hand forbidden, would result if the shares are taxed without a proportionate reduction in value on account of the bank's investment in the bonds. That the bonds are not taxed *eo nomine* cannot affect the rule. The consequence would be the same in either case.

It is as essential that the public faith be preserved as that individual grants and contract be maintained and enforced. A state must always preserve unsullied its good faith whenever it has been pledged, and its officers should never, by any nice refinement, open a way by which it may be violated. Those of our citizens who at the state's invitation purchased the state building bonds, and thereby enabled the state, at a time when, according to the evidence, there was little or no market for its obligations at par, to discharge its public functions by furnishing shelter and comfort to its unfortunates, and prisons for its criminals, and other necessary public buildings, should not, and will not, be required to pay, even though in the form of taxation, that from which by solemn compact, lawfully entered into, they are exempt. To do so would be to impair the obligations of their contract with the state, upon the inviolability of which the purchasers of the bonds had full right to rely. *Murray v. Charleston,* 96 U. S. 432, 24 L. Ed. 760. Legislative contracts are to be read in the light of the public policy

entered into and the purposes sought to be accomplished at the time they were made, rather than at a later period, when different ideas and theories may prevail. *Mobile & O. R. Co. v. Tennessee,* 153 U. S. 486, 14 Sup. Ct. 968, 38 L. Ed. 793. The wisdom of the Legislature in exempting the bonds from taxation involves a question of legislative policy, over which the courts have no right of review. In that respect its judgment is conclusive and binding upon all branches of the state government.

Aside from what we have said was the legislative purpose in respect to the taxation of said bonds, a well-founded doubt may exist as to the right of the state to tax the shareholders of a national banking association, owning state building bonds, without according to such shareholders the right ratably to deduct from the valuation thereof the amount of the capital and surplus invested in such bonds, in view of section 5219, Rev. Laws 1910, requiring that the taxation of such shares "shall not be at a greater rate than is assessed upon other moneyed capital, in the hands of individual citizens of such state." A somewhat similar question was involved in *New York ex rel. Willams v. Weaver et al.,* 100 U. S. 539, 25 L. Ed. 705, where it was held that the prohibition against the taxation of national bank shares at a greater rate than that imposed upon other moneyed capital in the hands of individual citizens could not be evaded by the assessment of equal rates of taxation upon unequal valuations, and that consequently where the state statute authorized individuals to deduct the amount of debts owing by them from the assessed value of their personal property and moneyed capital subject to taxation, the owners of shares of national banks were entitled to the same deduction. The cases of *Supervisors v. Stanley,* 105 U. S. 305, 26

L. Ed. 1044, *Hills v. Exchange Bank*, 105 U. S. 319, 26 L. Ed. 1052, *Evansville Bank v. Briton*, 105 U. S. 322, 26 L. Ed. 1053, *Cummings v. National Bank*, 101 U. S. 153, 25 L. Ed. 903, *American National Bank v. New York*, 121 U. S. 138, 7 Sup. Ct. 826, 30 L. Ed. 895, are applications of the same principle. See, also, *McHenry et al. v. Downer*, 116 Cal. 20, 47 Pac. 779, 45 L. R. A. 737.

It would seem that the rule announced in the foregoing cases must hold true in the case at bar, else a condition would exist whereby the taxability of the bonds would be made to depend upon the personality of their owners, or the statute under which the tax was sought to be collected. That is to say, that bonds belonging to individuals and to corporations, taxable upon the net value of their moneyed capital and undivided profits, would not be taxable, while those belonging to national, if not state, banks would in legal effect be taxable. We do not consider it necessary, however, to a decision of the case to decide this point, preferring to rest our conclusion upon the ground that the bonds being nontaxable for any purpose, the right of the shareholders to a proper credit on account thereof is sufficiently made to appear.

We have seen that the statute permitting the exemption of state bonds from taxation violates no provision of our Constitution. That it was not the purpose of the Legislature to tax the state building bonds issued under authority of the act of March 15, 1911, as evidenced both by the act itself and the subsequent act of March 11, 1915, is obvious. It was so recognized by the Governor, Attorney General, and State Treasurer, in office when the bonds were issued and sold. Until 1915 the law was so understood and administered by the state taxing authorities. Fully informed of the foregoing, and relying there-

on, the First National Bank of Chickasha purchased the bonds subsequently indirectly sought to be taxed.

From what we have said it follows that the action of the State Board of Equalization of August 4, 1915, and the subsequent action of the county board of equalization of Grady county, were violative of the rights of the bank and its shareholders, which had theretofore attached under its contract with the state; and that the judgment of the district court of Grady county, on appeal from the action of the county board of equalization, should be and is in all things affirmed.

All the Justices concur, except KANE, C. J., absent, and not participating.