## STATE v. SECURITY NATIONAL BANK OF MINNEAPOLIS.[1]

### January 11, 1918.

### No. 20,601.

**Taxation — state levy on shareholders in national bank.**

1. The state cannot tax a national bank upon its capital, but may tax its shareholders upon their stock in the bank, and may require the bank to apply any earnings distributable to its shareholders in payment of such tax.

**Same.**

2. Sections 2018 and 2021, G. S. 1913, impose a tax upon the stock of the shareholders and not upon the property of the bank.

**Same — sale of assets by national bank.**

3. Where a national bank sold and transferred all its property and assets before May 1, but retained the proceeds thereof until May 15 and distributed them to its shareholders on that date, the stock of the shareholders represented their interest in such proceeds on May 1 and is taxable therefor.

**Same — levy of tax after distribution of assets to shareholders.**

4. Defendant bank went out of business, and in May distributed all its property and assets to its shareholders. In the following October an assessment was made upon the stock of the shareholders, and pursuant thereto the tax in controversy was levied. As defendant had no funds of its shareholders in its possession at any time after the tax was levied, it cannot be required to pay such tax.

[1] Reported in 165 N. W. 1067.

In August, 1916, defendant bank was cited to appear before the district court for Hennepin county and show cause why it should not pay the sum of $68,816, taxes for the year 1915 upon its personal property which were delinquent and unpaid. The answer set up that on March 27, 1915, defendant bargained and sold all its assets of every description to the First National Bank of Minneapolis, which on that day were accepted and taken into the exclusive possession of the latter bank; that prior to that sale defendant had fully paid all taxes of every nature levied against it and its stockholders by the state of Minnesota or by any of its municipal subdivisions, and set out the proceedings mentioned in the opinion by which the sale was authorized and consummated. The answer also alleged that any judgment against defendant upon the pretended assessment of 1915 would be in violation of the express provisions of the statutes in reference to the taxation of national banks, of the Federal statutes in reference to the taxation of national banks, and of the Federal Constitution. The matter was heard before Hale, J., who made findings and ordered judgment for the amount demanded. Defendant's motion for amended findings was granted in part. From an order denying its motion for a new trial, defendant appealed. Reversed.

*Louis K. Hull* and *Lancaster, Simpson & Purdy,* for appellants.

The assessment and levy of tax against the bank is void upon its face and in excess of the power conferred upon the state by U. S. R. S. § 5219. Smith v. Webb, 11 Minn. 378 (500). Owensboro Nat. Bank v. City of Owensboro, 173 U. S. 664, 19 Sup. Ct. 537, 43 L. ed. 850. In Iowa the supreme court held that the levy of a tax was in fact upon the shares of stock, although in the name of the bank, and not upon the property of the bank. The United States Supreme Court held precisely the opposite. Home Savings Bank v. City of Des Moines, 205 U. S. 503, 27 Sup. Ct. 571, 51 L. ed. 901. The court said (p. 519) : "The two kinds of taxes are not equivalent in law, because the state has the power to levy one and has not the power to levy the other. The question here is one of power and not of economics." This language in regard to the construction of the Iowa statute is particularly pertinent to the construction to be put on section 2018, G. S. 1913. National State Bank v. Young, 25 Iowa, 311; Hershire v. First Nat.

Bank, 35 Iowa, 272; Farmers' and Traders' Nat. Bank v. Hoffmann, 93 Iowa, 119; Merchants' State Bank v. McHenry County, 31 N. D. 108, 153 N. W. 386; First Nat. Bank v. Fisher, 45 Kan. 726, 26 Pac. 482; Miller v. First Nat. Bank, 46 Oh. St. 424, 21 N. E. 860; State v. First Nat. Bank, 180 Mo. 717, 79 S. W. 943.

Prior to May 1, 1915, defendant had ceased to be a bank and had converted all its assets and good will into cash and actually appropriated the same to the shareholders in full liquidation of their rights as such shareholders. It sold and transferred on March 27, 1915, all of its tangible assets, and also its good will for the sum of five million dollars and received in payment therefor that sum in cash, the full amount thereof having been paid to it in two instalments, one on March 29, 1915, and the balance on April 1, 1915. All of its liabilities were assumed by the First National Bank. Prior to May 1, 1915, every stockholder of the defendant had actually executed and delivered to the defendant an approval, ratification and confirmation and appropriation of his proportionate share of that five million dollars and his subscription to the proposed increased capital stock of the First National Bank, and in addition thereto, had indorsed in blank his certificates of stock and surrendered the same to the bank for cancelation. The stockholders, therefore, of the defendant bank had done everything possible for them to do prior to May 1, 1915, to effectuate an actual and complete liquidation of the bank. So far, therefore, as this sale, transfer and delivery were concerned, no further act on the part of the stockholder was at all necessary. Both title and possession were complete in the First National Bank before May 1, 1915.

The state clearly could have no "lien" on the assets of the bank, unless the statute created it, and the only statutory lien for taxes is that of section 2180, G. S. 1913, "from and after the time the tax books are received by the county treasurer." In this case it is stipulated that the tax books were not in fact delivered to or received by the county treasurer until January 3, 1916.

*John M. Rees,* County Attorney, and *Frank J. Williams,* Assistant County Attorney, for respondent.

The law is constitutional and the assessment is valid. National Bank

v. Com. 9 Wall. 363; Aberdeen Bank v. Chehalis County, 166 U. S. 440, 17 Sup. Ct. 629, 41 L. ed. 1069. The cases of Owensboro Nat. Bank v. City of Owensboro, 173 U. S. 664, 19 Sup. Ct. 537, 43 L. ed. 850, and Home Savings Bank v. City of Des Moines, 205 U. S. 503, 27 Sup. Ct. 571, 51 L. ed. 901, relied on by defendant, do not in any manner attempt to overrule the cases of National Bank v. Com. and Aberdeen Bank v. Chehalis County.

It is immaterial whether the bank was a going concern on May 1, 1915. The bank was not liquidated on May 1, 1915. This is a tax against the stockholders on account of shares of stock owned by them in a corporation. The only pertinent inquiry in this connection is, did the stockholders, as such, have any interest in the defendant corporation on May 1? If any distribution of its assets among its stockholders is shown at all by the evidence, it could not have been prior to May 15, 1915.

By reason of the process of the statutory garnishment contained in section 2021, G. S. 1913, the earnings of the bank, in such an amount "as may be necessary" were garnished for the purpose of collecting the tax. This garnishment affixes itself as of the date fixed by law for the assessment of personal property, to wit: May first of each year, and continues until the tax is paid. If the bank disburses the funds so garnisheed, without indemnifying itself against the payment of the tax, it cannot be heard to complain if compelled to pay the tax out of its own funds; for in such a case it is through its own fault a negligence that it is damnified. The ordinary process for the collection of a tax, to wit, judgment and execution may be put in operation against the bank.

The bank still has control, through its liquidating committee, over the five million dollars assets which it owned on May 4, for the purpose of paying the debts of the corporation. The liquidation committee appointed by the bank on May 4, 1915, has never met (Finding No. XII, fol. 67). Money earned by a corporation remains the property of the corporation and does not become the property of the stockholders unless and until it is distributed among them by the corporation. 1 Thompson, Corp. (2d ed.) § 805; 3 Clark and Marshall, Private Corp. §§ 627 and 644; Gibbons v. Mahon, 136 U. S. 549, 10 Sup. Ct. 1057, 34 L. ed. 525.

*Lancaster, Simpson & Purdy,* for appellants.

### IN REPLY.

In National Bank v. Com. 9 Wall. 363, the only questions involved were: (1) Was the assessment in substance, if not in form, upon the shares of stock rather than upon the capital stock of the bank, as claimed by the bank's counsel, and the court squarely held that it was; and (2) was the bank entitled to deduct from the assessment on the shares of stock belonging to the stockholders government bonds held by it, and the court held that it was not. In Aberdeen Bank v. Chehalis County, 166 U. S. 440, 17 Sup. Ct. 629, 41 L. ed. 1069, no question whatever was made but that the bank had in its possession and under its control funds belonging to the stockholders severally, from which to pay the tax as levied. In Charleston Nat. Bank v. Melton (C. C.) 171 Fed. 743, the court explicitly eliminates from the case the question which is so prominent in this, viz., whether the bank had sufficient funds of the stockholders to pay all taxes against the shares of stock.

Counsel for the state are in this dilemma. If they contend that the tax is properly assessable against the bank, not as agent or trustee of the shareholders, then the assessment is absolutely void, being in excess of the power delegated by Congress to the states to tax the shares of national banks against the shareholders, as other personal property belonging to such shareholders; or, if they contend that the assessment is in form and substance upon the shares of stock and against the shareholders, but that the bank is absolutely liable, regardless of whether it has in its hands any funds, such as is prescribed by section 2021, G. S. 1913, from which to reimburse itself, then the same is void.

The bank was not only out of business and no longer a "going concern," but the stockholders themselves had surrendered absolutely their certificates for cancelation and accepted in place thereof their proportionate shares of the five million dollar fund and appropriated the same to the payment of their subscriptions for stock in the First National Bank. The course adopted accomplished precisely the same object as if defendant had executed to its stockholders after they had surrendered the certificates of stock and executed their combination proxies, checks for each stockholder's proportionate share in the five million dollar fund, and each stockholder had indorsed his check and left it to be delivered to the

First National Bank in payment of his new subscription. There was in fact prior to May 1 a liquidation agreed upon and approved by the individual action of every stockholder and an appropriation of the assets of defendant bank to their use and benefit.

The state concedes defendant bank was not a going concern after March 27 and the court found (P. B. pp. 20, 68) that it had never done any business, *banking or otherwise,* or received any income after ·that day. This makes it absolutely certain defendant never had in its hands any annual earnings accruing after that day.

TAYLOR, C.

This is a proceeding to collect from the Security National Bank of the city of Minneapolis the amount of a personal property tax upon the shares of its stock. The bank interposed as a defense that it had sold and transferred all its property of every kind and nature and had distributed the proceeds thereof to its shareholders and had gone out of business before the tax accrued. The trial court directed judgment for the amount of the tax and the bank appealed from an order denying a new trial.

The Security National Bank, originally organized as a state bank, was incorporated as a national bank in 1907, with a capital stock of one million dollars, and conducted a general banking business until it sold and transferred all its business and assets to the First National Bank of Minneapolis in 1915. In the early part of 1915, an arrangement was made to combine and consolidate the two banks into one. To accomplish this purpose the board of directors of the First National Bank, on March 19, 1915, unanimously adopted a resolution to purchase all the assets and good will of the Security National Bank, subject to all its liabilities and obligations, for the sum of five million dollars; to increase the capital stock of the First National Bank from $2,500,000 to $5,000,000; to set aside 20,000 shares of this increase in capital stock for sale to the shareholders of the Security National Bank at $250 per share and in the proportion of two shares of this stock for each share of the stock of the Security National Bank held by them; and directing the executive officers to call a meeting of the shareholders of the First National Bank for May 4, 1915, to consider and vote upon the several propositions. The resolution contained a provision by which it did not become effective un-

less the shareholders of the First National Bank voted the proposed increase of its capital stock, and the shareholders of the Security National Bank subscribed for 20,000 shares of such stock upon the prescribed terms.

On the same day, March 19, 1915, the shareholders of the Security National Bank held an adjourned annual meeting at which more than two-thirds of all its capital stock was represented. These shareholders unanimously adopted a resolution in which the resolution adopted by the board of directors of the First National Bank was set forth in full, and which authorized and directed the officers of the Security National Bank to make the proposed sale upon the proposed terms, and to do all acts necessary or proper to carry it into effect. On the same day, March 19, 1915, the board of directors of the Security National Bank adopted a resolution in which the resolution adopted by the shareholders was set forth in full, and which authorized and directed the executive officers to make the proposed sale and to do all acts necessary or advisable to carry it into effect, and to call a meeting of the shareholders for May 4, 1915, for the purpose of voting upon placing the bank in liquidation and upon any matters necessary to carry out the propositions contained in the resolutions. To insure the consummation of the project, the individual shareholders of the Security National Bank executed instruments (all of the same tenor and too lengthy to quote), in which each shareholder for himself assented to and approved all the propositions contained in the several resolutions, and the proposition to liquidate the Security National Bank, and subscribed for two shares of the proposed increase in the capital stock of the First National Bank for each share held by him in the Security National Bank; and in which he also authorized the Security National Bank and its executive officers to accept the certificates for such stock when ready for delivery and to pay therefor out of any funds in its or their hands belonging to him from the liquidation of the Security National Bank; and in which he also appointed George K. Belden or L. L. Dodge or Frank K. Pratt, as his proxy, to vote his stock in favor of these several propositions at the shareholders' meeting to be held on May 4, 1915. Before March 27, 1915, nearly all the shareholders of the Security National Bank executed one of these instruments and delivered it, together with his certificates of stock indorsed in blank,

to the attorney of the bank, and the few who had not done so before that date did so before the first day of May, 1915. Before March 27, 1915, individual shareholders of the First National Bank representing more than two-thirds of the capital stock of that bank, executed and delivered instruments, all of the same tenor, in which all such shareholders assented to and approved all the propositions embraced in the several resolutions, waived his preference right to purchase any of the shares of the proposed increase in the capital stock allotted to the shareholders of the Security National Bank, and appointed George P. Flannery, David F. Simpson and Dana L. Case as his proxies to vote his stock in favor of the several propositions at the shareholders' meeting to be held on May 4, 1915.

After a sufficient number of the shareholders of each bank had assented to the several propositions and directed their respective representatives to vote their stock in favor of the same to insure the approval and carrying out of such propositions, and on March 27, 1915, the Security National Bank transferred and delivered all its property and assets of every kind and nature to the First National Bank and quit business entirely. Shortly afterwards the First National Bank entered upon its books a credit of five million dollars to the "Security National Bank in liquidation." On May 4, 1915, the shareholders of the First National Bank duly voted to increase its capital stock to five million dollars, and ratified and confirmed the resolution of March 19 and all things done thereunder, and the shareholders of the Security National Bank ratified and approved the resolutions of March 19, and voted that the Security National Bank be placed in voluntary liquidation and appointed a liquidating committee. On May 14, 1915, the comptroller of the currency approved the increase of the capital stock of the First National Bank, and on the following day, May 15, 20,000 shares of such stock were issued and delivered to the shareholders of the Security National Bank pursuant to their subscriptions therefor made as hereinbefore stated. The purchase price for these shares exactly equalled the five million dollars to be paid for the property of the Security National Bank, and by direction of the officers of that bank the five million dollars credited to the "Security National Bank in liquidation" as above stated was applied as payment for such shares, and was credited in proper amounts to the respective share-

holders, to whom such shares were issued, as received in payment for such shares. At the same time, the stock certificates of the Security National Bank, indorsed in blank by the respective holders thereof, were delivered to the First National Bank and marked "canceled."

The Security National Bank made no return of its capital stock for taxation in the year 1915; but the five million dollars which on May 1, 1915, stood on the books of the First National Bank as a credit to the "Security National Bank in liquidation," was assessed as money and credits and, as a matter of convenience and by agreement with the assessor, this assessment was placed against the First National Bank. The tax upon this assessment in the sum of $15,000 was subsequently paid. The rate upon money and credits is much less than the rate upon capital stock and in October, 1915, the assessment of the capital stock upon which the tax in controversy is based was made by direction of the State Tax Commission.

1. Defendant contends that the tax in controversy is "in form and substance upon the capital stock of the bank and against the bank, and not upon the shares of stock and against the shareholders," and is void for that reason.

That a state cannot tax a national bank upon its capital, but may tax its shareholders upon their stock in the bank is conceded and is too well settled to require discussion. It is also settled that the state, by statute, may require the bank to pay the tax upon the stock of its shareholders out of any funds in its possession available for that purpose, that such statutes make the bank a sort of equitable or statutory garnishee and may provide an appropriate procedure for enforcing payment from it. Nat. Bank v. Commonwealth, 9 Wall. [76 U. S.] 353, 19 L. ed. 701; First Nat. Bank v. Chehalis County, 166 U. S. 440, 17 Sup. Ct. 629, 41 L. ed. 1069; Merchants and M. Bank v. Pennsylvania, 167 U. S. 461, 17 Sup. Ct. 829, 42 L. ed. 236.

The present question is whether our statute imposes the tax upon the bank, or upon the interest of the shareholders in the bank, upon the capital of the bank, or upon the stock of the shareholders.

The statute provides that the stock of every bank shall be assessed in the name of the bank; that the proper officer shall list all shares of the bank for assessment; that, "to aid the assessor in determining the value

of such shares of stock, the accounting officer of every such bank ＊ ＊ ＊ shall furnish to the assessor a sworn statement showing the amount and number of the shares of the capital stock, the amount of its surplus or reserve fund and amount of its legally authorized investments in real estate;" that "the assessor shall deduct the amount of investments in real estate from the aggregate amount of such capital and surplus fund, and the remainder shall be taken as a basis for the valuation of such shares in the hands of the stockholders;" and that to secure the payment oi taxes upon bank stock every bank shall, "before declaring any dividend, deduct from the annual earnings of the bank such amount as. may be necessary to pay any taxes levied upon the shares of the stock, and such bank ＊ ＊ ＊ shall pay the taxes, and shall be authorized to' charge the·amount of such taxes paid to the expense account of such bank." G. S. 1913, §§ 2018, 2021. Having in mind that the tax is valid if upon the stock as representing the interest of the shareholders and therefore in substance against the shareholders, but is void if upon the property of the bank and therefore in substance against the bank; and that a statute should not be so construed as to render it void, if it be fairly and reasonably susceptible of a construction which will render it valid and accomplish the purpose intended by it, we hold that the statute in question imposes the tax upon the stock as the property of the shareholders and as representing their interest in the bank, and that the tax is valid. State v. Barnesville Nat. Bank, 134 Minn. 315, 159 N. W. 754.

2. Defendant further contends that it "was not a going concern on May 1, 1915, and that its stockholders were not subject to taxation on the shares of stock for the year 1915."

The statute provides that "personal property shall be listed and assessed annually with reference to its value on May 1." Consequently the present question is whether this stock had value on May 1. That it did we think is too clear to require extended discussion. True defendant quit business on March 27 and turned over all its assets to the First National Bank on that date, but this transaction was not completed, and under the resolutions adopted by the banks, could not be completed until after the meeting of the shareholders of the First National Bank on May 4. But passing this fact, the stock represented the interest of the shareholders in the property of defendant as well after defendant ceased to

be a going concern as before, and whether such property consisted of the assets sold and transferred to the First National Bank or of the five million dollars agreed to be paid for such assets by that bank. The stock represented the interest of the shareholders in the assets of defendant until the assets were disposed of, and thereafter represented the interest of the shareholders in the proceeds of the assets until such proceeds were distributed to the shareholders, and this did not take place until May 15. The interest of its shareholders in the property of defendant did not terminate until they accepted the shares of the First National Bank in payment of the distributive share to which their stock in defendant would otherwise have entitled them at the liquidation of defendant.

3. Defendant further contends that, even if the stock of its shareholders was taxable in 1915, the tax cannot be enforced against defendant, for the reason that defendant has never had any funds belonging to its shareholders since the tax was levied.

The tax is against the shareholders and the statute merely makes use of the bank as a convenient instrumentality for collecting it from the shareholders. Although the stock of a bank represents the interest of the shareholders in the capital as well as in the earnings of the bank, the state cannot require a national bank to impair its capital by paying the tax of its shareholders. Our statute recognizes the limited power of the state, and simply requires that the tax upon the stock be paid out of the earnings distributable to the holders of such stock. Defendant was in business and made earnings for nearly three months in 1915. It then closed its doors and went into voluntary liquidation, and thereafter each and every shareholder surrendered his stock and received and accepted his proportion of the assets by applying it in payment for stock in the First National Bank. By this transaction, which was completed on May 15, 1915, the entire assets of defendant were in effect distributed to its shareholders, and since that date defendant has had no property of any kind. By this distribution, the earnings then on hand were in effect paid to the shareholders as a dividend, and the real question is whether the statutes imposed upon defendant the duty to retain sufficient of these funds to pay the tax in controversy.

A tax is not a lien upon property except as made so by statute. State

v. Bellin, 79 Minn. 131, 81 N. W. 763; Gould v. City of St. Paul, 120 Minn. 172, 139 N. W. 293. The statute provides:

"The taxes upon personal property shall be a lien upon the personal property of the person assessed from and after the time the tax books are received by the county treasurer." G. S. 1913, § 2180. As the tax books embracing the tax in controversy were not delivered to the county treasurer until long after defendant had disposed of all its property, the tax never attached as a lien upon such property, even assuming that this statute gives a lien upon the property of the bank for the tax of its shareholders.

Counsel for the state insists, however, that the provision that every bank shall, before declaring any dividend, deduct from the annual earnings of the bank such amount as may be necessary to pay any taxes levied upon the shares of stock, imposed upon defendant the duty to withhold a sufficient amount from the funds distributed in May to pay the tax in controversy. The bank is required to retain sufficient of its earnings "to pay any taxes *levied* upon the shares of stock." The term "levied" as used in our tax laws has different meanings in different parts of the laws. It sometimes refers to the legislative act of imposing the tax, and sometimes to the administrative act of making the assessment, and extending the tax upon the tax lists. State v. Lakeside Land Co. 71 Minn. 283, 73 N. W. 970. Here the term plainly refers to the administrative act, and the tax was not "levied upon the shares of the stock," until it was entered upon the tax lists. The term "levied" is in the past tense and denotes past time—something already done; and the language used cannot fairly be construed as requiring the bank to withhold from its shareholders sufficient funds to pay whatever tax might be levied at any time in the future. If the legislature had intended to require banks to retain sufficient funds to pay a tax of unknown amount to be imposed in the future, they would have used language plainly indicating that such was their intention. When a bank pays a dividend it knows, or can readily ascertain, the amount of any tax upon the shares of its stock then entered upon the tax lists, and must make provision for the payment of such tax, but the statute does not require it to provide at that time for a tax neither due nor levied and the amount of which cannot then be ascertained. State v. Barnesville Nat. Bank, 134 Minn. 315, 159 N. W. 754.

As defendant has had no funds belonging to its shareholders at any time after the tax was levied, it follows that it cannot be required to pay this tax of its shareholders and that this proceeding cannot be sustained.

Order reversed.